# DANIEL T. ROLL AND WILLIAM EDWARD SCHOLL
# *v*. STATE OF MARYLAND

[Nos. 578 and 579, September Term, 1971.]

*Decided March 27, 1972.*

The cause was argued before ANDERSON, ORTH and GILBERT, JJ.

*Raymond W. Russell* for appellant in both cases.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Jeffrey Russell Werner, Assistant State's Attorney for Montgomery County,* on the briefs in both cases, for appellee.

ORTH, J., delivered the opinion of the Court.

It is not surprising that the power to cite and punish for contempt of court is at times misunderstood by judges asserting it, by appellate courts reviewing it, and by legislatures enacting laws involving it. The law concerning contempt cries for specificity in definition and uniformity in application. It is ofttimes perplexing and sometimes uncertain.[1] That its confusions may not be as serious in the overall administration of justice as are caused, for example, by the difficulties arising from the subtle dis-

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, June 29, 1972.

1. See *Contempt of Court: A Survey,* by Dan B. Dobbs, 56 Cornell Law Review 183-284 (1971); *The Contempt Power: the "Barnett" Dictum has Matured in "Bloom"; But is the Hybrid Viable?,* by Harry H. Davis, 11 Arizona Law Review, 501-530 (1969).

tinctions with respect to offenses comprising the unlawful appropriation of personal property, see *Farlow v. State,* 9 Md. App. 515 and *Couture v. State,* 7 Md. App. 269, is only because there seem to be fewer contemnors than thieves. But this is of little solace to the person who is found to be contemptuous and punished therefore. See *Muskus v. State,* 14 Md. App. 348; *Goldsborough v. State,* 12 Md. App. 346. While the difficulties involved in the law concerning the stealing of goods usually run against the prosecution, the mischiefs stemming from the confusions surrounding contempts of court frequently derogate the rights of the individual. The cases before us provide two more examples.

DANIEL T. ROLL and WILLIAM EDWARD SCHOLL were each found to be in contempt of court by the Circuit Court for Montgomery County for refusing to testify before the October Term, 1971, grand jury. They were called before that body to obtain their testimony concerning certain violations of those laws which are codified in the Annotated Code of Maryland (1957) as §§ 276-302 of Article 27 under the subheading "Health —Controlled Dangerous Substances." Thus they were subject to the provisions of § 298 (c) thereof. That section, consisting of one paragraph composed of one sentence,[2] has three aspects. First, it makes a refusal, on the ground of self-incrimination, to testify concerning any violations of the law relating to controlled dangerous substances a contempt of court. Second, it makes a person called to testify concerning such violations a competent and compellable witness. Third, it obviates constitu-

---

2. "No person shall, upon pain of contempt of court, refuse to testify concerning any violations of the provisions of this subheading because his testimony might tend to incriminate him or implicate him in such violations and every such person shall be a competent witness and compellable to testify against any person who may have committed any of the offenses set forth under this subheading, provided that any person so compelled to testify on behalf of the State in any such case shall be exempt from prosecution, trial and punishment for any and all such crimes and offenses about which such person was so compelled to testify." Code, Art. 27, § 298 (c).

tional objection to its provisions by supplanting the constitutional privilege against compulsory self-incrimination with a grant of immunity from prosecution, trial and punishment. Appealing from the judgments,[3] Roll and Scholl contend that the statute is unconstitutional on its face because the immunity provisions are too limited.[4]

## THE CONSTITUTIONALITY OF CODE, ART. 27, § 298 (c)

In *Brown v. State*, 233 Md. 288, the Court of Appeals had occasion to determine the constitutionality of a statute with comparable immunity provisions. Code, Art. 27, § 23, dealing with bribery, provided:

> "* * * and any person so bribing or attempting to bribe or so demanding or receiving a bribe shall be a competent witness, and compellable to testify against any person or persons who may have committed any of the aforesaid offenses; provided, that any person so compelled to testify in behalf of the State in any such case shall be exempt from prosecution, trial and punishment for any such crime of which such person so testifying may have been guilty or a participant therein, and about which he was so compelled to testify."

At the time *Brown* was decided on 13 January 1964, *Malloy v. Hogan*, 378 U. S. 1, making the privilege against self-incrimination guaranteed by the Fifth

---

3. See Code, Art. 51, §§ 1 and 18; *Tyler v. Baltimore County*, 256 Md. 64, 71.

4. Neither Roll nor Scholl suggest that testimony before a grand jury is not within the ambit of the statute. In any event we would have no difficulty in finding that it is. The statute refers simply to a person testifying, it does not define or limit the occasion of the testifying. And it is firmly established that the privilege against self-incrimination is applicable to a witness in grand jury proceedings. *Brown v. State*, 233 Md. 288, 300-302. *State v. Panagoulis*, 3 Md. App. 330, 335-336, affirmed on certiorari, 253 Md. 699.

Amendment of the federal constitution [5] applicable to state prosecutions, was five months in the future. But the Court thought that the federal provision and Art. 22 of the Maryland Declaration of Rights [6] were in *pari materia* and should receive a like construction. It found the general rule to be that "in order to be valid, the immunity granted must be as broad as the privilege against self-incrimination which it supplants or displaces." At 296. It said that historically the foundation of the rule was *Counselman v. Hitchock,* 142 U. S. 547.[7] In *Counselman* the Supreme Court held that a congressional statute merely protecting a witness from direct use of his testimony in subsequent prosecutions did not confer an immunity coextensive with his privilege. The witness must be protected from the indirect as well as the direct use of the compelled testimony. "In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecutions for the offense to which the question relates." *Id.,* at 586. This language was dicta but it seemed to leave open the possibility that the Fifth Amendment might require that transactional immunity be given and that testimonial immunity might be insufficient. Appellants seize on this possibility and assert that the Fifth Amendment does require the grant of transactional immunity and that the *Brown v. State, supra,* holding that it did not was wrong. They find support in *Brown v. Walker,* 161 U. S. 591, which upheld an immunity statute passed by Congress in response to the language in *Counselman.* This statute was interpreted by federal courts to grant transactional immunity, thereby barring the government from prosecuting a witness for any crime mentioned by him during the course of his testimony. See *People v. Labello,* 24

5. "No person * * * shall be compelled in any criminal case to be a witness against himself."

6. "That no man ought to be compelled to give evidence against himself in a criminal case."

7. "It is quite clear that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply one, at least unless it is so broad as to have the same extent in scope and effect." 142 U. S. at 585.

N.Y.2d 598, 249 N.E.2d 412 (1969). However, our Court of Appeals said in *Brown v. State, supra,* at 297:

> "In our opinion an immunity statute, in order to be valid, need not be couched in precisely the same terms as that suggested in Counselman and upheld in *Brown v. Walker, supra,* if its effect is to grant protection as broad as that afforded by the privilege which it displaces. We think that such protection is afforded by the immunity granted by Section 23 of Article 27 of the Code (1957). The immunity thereby granted to the witness compelled to testify from 'prosecution, trial, and punishment for any such crime of which such person so testifying may have been guilty or a participant therein and about which he was so compelled to testify' is a broad immunity. Since it bars 'prosecution,' it effectively bars the use of 'leads' to convict the witness of the offense as to which he testifies, * * *."

The Court thought that references to a requirement of absolute immunity in Supreme Court cases following Counselman "refer to immunity from prosecution as opposed to immunity merely from the later use as evidence of recorded testimony, and that as to the range of offenses, they do not require a greater protection than that the statute must bar prosecution for all offenses with regard to which the testimony of a witness may be compelled. As to other offenses, we think, the privilege is neither impaired nor supplanted." At 298.

We think the reasons advanced for upholding the constitutionality of Art. 27, § 23 are apposite to the statute here challenged. We find no authority compelling a departure from the Court of Appeals' holding. The federal courts are still undecided as to whether a transactional type of immunity must be conferred constitutionally in the absence of state statutes so providing, the federal circuits being divided on the issue. *In the Matter*

of *Korman and Likas,* 449 F. 2d 32 (U.S.C.A. 7th Cir.) was decided on 20 May 1971. The Court believed that *"Counselman* announced a constitutional requirement that, if the federal government seeks to compel a witness to testify, it must grant him full transactional immunity from prosecution under its laws." [8] On the other hand, the Court of Appeals for the Ninth Circuit in *Stewart v. United States* and *Kastigar v. United States,* 440 F. 2d 954, decided 29 March 1971, held otherwise, feeling that the grant of merely testimonial immunity was sufficient.[9] Hopefully the Supreme Court will shed some light on the question in the near future. It granted certiorari in the *Stewart* cases, sub nom *Kastigar v. United States,* 402 U. S. 971, and they were argued 11 January 1972. But in the meantime we shall abide with the ruling in *Brown v. State, supra.* We hold that § 298 (c) of Art. 27 is constitutional on its face.

## THE CONTEMPT PROCEEDINGS

### The Factual Posture—Roll

At the State's request Roll had been summoned by the Sheriff to appear before the grand jury on 20 October 1971 in the matter of Grand Jury v. Michael L. Ingram, Helen Marie Ingram and Thomas Robert Yendell. He appeared in compliance with the summons. A transcript of the proceedings discloses what occurred. It shows that on 20 October 1971 Roll appeared before "Jane B. Keys, Foreman, and a quorum of the Grand Jury" and was examined by Jeffrey R. Werner, Assistant State's Attorney.[10] Roll gave his name, and said he had no attorney at

8. It further believed that *Murphy v. Waterfront Commission,* 378 U. S. 52 did not overrule *Counselman sub silentio.* At 38-39. As we do not agree with the 7th Circuit's interpretation of *Counselman* whether *Murphy* does or does not restrict or limit a transactional immunity requirement is immaterial.

9. See case note on *People v. Masiello,* 28 N.Y.2d 287, 270 N.E.2d 305 in 38 Brooklyn Law Review 222, 229-230.

10. Roll had been sworn by the Clerk of the Circuit Court for Montgomery County as a witness to testify before the grand jury pursuant to Code, Art. 51, § 14 (3).

that time, not having personally consulted an attorney. The prosecutor asked: "You are aware, Mr. Roll, that you have been served a summons to appear to testify against Ingram, Ingram and Yendell, concerning a house on 1714 Dublin Street in Silver Spring during this past year?" Roll said he was so aware. Informed by Werner that he was going to ask him questions, Roll said: "Before you do that I'd like to make a statement." Werner made clear what he was going to do:

> "Let me just advise you as to what I am going to do before you make a statement. I am going to ask you some questions concerning the period from December of 1970 through April 1971, involving yourself and possibly other people, the Ingrams, Tommy Yendell, and the activities occurring at 1914 (sic) Dublin Drive in Silver Spring involving controlled dangerous substances, more specifically heroin and marijuana. That is all I am going to ask you about. That is the scope of my questions. Any answers you may give that implicate you in any kind of crime whatsoever will not cause you to be prosecuted but we will give you automatically a grant of immunity as to those questions. Now what would you like to say?"

Roll made his statement:

> "First I'd like to state that I am without legal representation. Number two, as a resident of the regional district I resent being called to this hearing because for many reasons it puts me in a precarious position with my participation in the program which I participate in and my situation with the rest of the people whom I associate with on the street.
>
> This places my program in precarious position, having myself testify in this manner which they do not approve of, in court. This puts me

in the position of physical danger from my peers upon this, whatever evidence I may give, if this is used in court there is true physical danger; number two, the stigma that would be attached to me, more importantly to the program of RAP, Incorporated, itself, in the eyes of heroin addicts in Montgomery County, of whom there are quite a few; would tend to draw them away from our program instead of encouraging their participation in it, which is something I don't want to see happen, and the Program doesn't want to see it happen.

And in light of these things I would like to be disqualified as a witness."

Werner told him that all those things had been taken into consideration and denied his request. Roll then refused to testify on the ground that it tended to incriminate him. Werner explained that the law granted him immunity so that he could not incriminate himself and read § 298 (c) to him. Although admitting that he had been duly served with a subpoena and been informed as to the scope of the questioning, he reasserted his refusal to testify. He understood he was subject to contempt of court and possible imprisonment "up to and including March 1, 1972." He was asked several specific questions and invoked the Fifth Amendment. He insisted he did not have the assistance of an attorney with respect to the matter. He was adamant in his refusal to answer questions.

The Assistant State's Attorney promptly submitted a "Petition for Direct Contempt" to the Circuit Court for Montgomery County. Entitled State of Maryland v. Daniel T. Roll, and docketed as miscellaneous petition 4489, it moved the court "to punish [Roll] for direct contempt of court for his refusal to testify before the Grand Jury of Montgomery County after being duly served notice in the matter of State v. Ingram, Ingram and Yendell, on October 20, 1971." In support of the motion the petition alleged that Roll had been duly served

notice that his testimony was required "before the Grand Jury in a Presentment against Michael Lawrence Ingram, Helen Marie Ingram and Thomas Robert Yendell," that he was sworn to testify on 20 October, that he appeared before the Grand Jury and "in answer to questions put to him by the prosecutor concerning the Presentment against Ingram, Ingram and Yendell, refused to answer said questions in any manner," that he had been initially informed that his requested testimony concerned criminal controlled dangerous substances and that he was competent and compellable to testify being immune from prosecution, trial and punishment under Code, Art. 27, § 298 (c). The petition asked the court to order Roll to show cause why he should not be held in direct contempt.

At 3:55 p.m. the same day Roll was brought before the Court, Moorman, J., presiding. The judge said that due to the nature of the proceeding the courtroom would be cleared. The Assistant State's Attorney suggested that only "the court and the stenographer and the clerk and the forelady [of the Grand Jury] and myself and the defendant [Roll]" be permitted to remain. As far as we can ascertain from the record, the suggestion was carried out. The court addressed Roll:

> "You know why you are before the Court. You are here on a petition that asks that you be held in contempt of the Court for refusal to testify before the grand jury."

Affording no opportunity for Roll to reply the court informed the prosecutor that it would hear his testimony. The State called Mrs. Jane Keys. She testified she was the forelady of the Grand Jury then sitting in Montgomery County (October Term 1971). On that day, 20 October, it was hearing presentments. A certificate by the Clerk of the Court that Roll had been sworn as a witness to testify before that grand jury was admitted in evidence. Mrs. Keys said that Roll was before the Jury to testify concerning a presentment or indictment then pending the Jury's consideration but there was no pre-

sentment outstanding against him. He took the witness stand, was advised that he would have immunity concerning his testimony, was questioned and refused to answer. Upon inquiry by the court Roll said he had no questions of the witness.

Johanna S. Wissenbach, identified in the transcript as "an official clerk to the Grand Jury for Montgomery County, October 1971 Term", was called by the State and "read the proceedings before that body involving [Roll] on the same day." The proceedings as read were not transcribed for the record of the hearing but there is included in the record before us a transcript of the proceedings before the Grand Jury so read. What the transcript discloses was above summarized. Upon the reading into evidence of the proceedings before the Grand Jury the State said it had no other evidence. The court asked Roll if he wanted "to take the stand to show any reason why you should not be held in contempt of the court for failing to testify before the grand jury after you were promised immunity." Roll took the stand and was sworn. The transcript reads:

"THE COURT: You may make whatever statement you would like to make to the Court. Before you make any statement I tell you: if it pertains to this presentment before the grand jury on which you were called to testify, the Court again affirms or reaffirms what the State has told you, that you are granted immunity from prosecution in relation to any testimony that you may give concerning this matter or narcotics in relation to the people brought before the grand jury on a presentment.
Do you understand that?

THE RESPONDENT: Not clearly. Would you please repeat that?

THE COURT: Before you testify whatever you want to say at this particular time, you are given the opportunity to show cause why you

should not be held in contempt of court. And the Court tells you that in your testimony or statement to the Court, if you should make any statements that may tend to incriminate you in relation to the presentment against the other three people, the Court assures you that you will be promised immunity from prosecution.

Primarily what you are here for is to show cause why you should not be held in direct contempt of court for refusing to testify.

THE RESPONDENT: Well—

THE COURT: I may tell you before you proceed: *prima facie* it appears that you have a great deal to overcome. I do not want to cite you for contempt of court and have to incarcerate you. I will give you an opportunity.

Maybe by this time you would want to go before the grand jury and testify. The proceedings before the grand jury are secret; that is why we cleared everyone from the courtroom.

Now you may make any statement you like."

Roll said he was without counsel regarding his grand jury appearance and that even with immunity he was left in "a very dangerous situation." The State conceded that he "would likely be called" as a witness at the trial of any indictment returned on the matter which he was being requested to testify. Roll said:

"That would place both myself and the program that I participate in, in Regional Participation, in a very bad position in what they are trying to do, what I'm trying to do for myself; and not just, you know, fear of being shot in retaliation. Just the fact that I was a juvenile at that time [he was 18 years of age at the time of the hearing] is the only thing that's kept me from being a defendant in that trial."

He reiterated that he was without legal representation and said "it is my understanding from what I have been

told from people that are not lawyers that I could leave the grand jury room at any time to consult a lawyer on any question I was asked." He asked the court if that were true and the court said: "I think that may be partially true." Roll then made a specific request: "I would like to request a hearing after I obtain legal counsel of my own choosing." The court asked the Assistant State's Attorney what he thought of that and he said the State had no objection. He pointed out, however, that the State was going to ask the grand jury to deliberate on the presentment involved that day and that he had talked to the Rehabilitation Addiction Prevention organization representatives and their lawyer that morning. The lawyer told the Assistant State's Attorney that he represented Roll and the prosecutor added, "as a matter of fact I saw him with the defendant as he was downstairs at the grand jury waiting to come up here. And, the Assistant State's Attorney said, "I recognize much of the language [Roll] represents before the grand jury as having been represented to me in my office this morning in the presence of RAP's attorney." Roll countered by stating that although he had talked to the lawyer, William Noble, who had represented him at a previous trial, that morning "it was not pertaining to any legal matter whatsoever. He said that Judge Tracy sent his regards, and he informed me that any previous charges have been dropped. * * * He was no longer retained as my legal representative * * * I have not consulted Mr. Noble about the stratagem or legal aspects" although Noble had informed him he would be served with a subpoena.

The court found Roll "in direct contempt of court." It asked: "Now do you think you want to go before the grand jury, now, this afternoon, and give your testimony?" Roll replied by asking to be incarcerated in the custody of RAP, Incorporated. The court imposed sentence.

*The Factual Posture—Scholl*

At the time Scholl's testimony was desired by the grand

jury he was incarcerated in the Maryland Correctional Institution at Hagerstown serving a sentence of three years. The State's Attorney prayed the court to issue a writ of habeas corpus ad testificandum so Scholl could appear to testify in the case of Grand Jury v. Michael Lawrence Ingram, Helen Marie Ingram and Thomas Robert Yendell on 20 October 1971. The court ordered the writ issued as prayed. Scholl appeared before the grand jury in compliance with the writ.[11] The transcript of the proceedings of the grand jury relating to Scholl's appearance discloses that Scholl said he had an attorney, Page Digman, Esq., whom he had consulted that day and previously and who was aware that he had been called to testify. He was aware that he was to testify and what the subject matter was. Werner then further informed him of the nature of the inquiry in substantially the same language used when Roll was informed. Werner read § 298 (c) to Scholl and asked if he were willing to answer questions. Scholl said, "No." Asked if he would like to consult his attorney "before continuing to refuse to answer our questions," Scholl said his attorney was "not available at the present." Directly asked if he desired to consult with an attorney, Scholl said, "No." He said he realized that in refusing to answer questions asked he might "be punishable by the court including imprisonment * * * for contempt of court." He was asked: "Mr. Scholl, between December 12, 1970 and April 13, 1971, did you ever see or purchase any heroin from Mike or Marie Ingram or Tommy Yendell at 1714 Dublin Drive, Silver Spring, Montgomery County, Maryland?" He stood on the Fifth Amendment. He realized that he had "no rights under the Fifth Amendment," that he had "immunity instead," but he refused to answer the questions. The transcript concludes: "A recess was taken, following which there were no further proceedings in the grand jury room on this day in the above-captioned matter."

---

11. Scholl had also been sworn by the Clerk of the Circuit Court for Montgomery County as a witness to testify before the grand jury pursuant to Code, Art. 51, § 14 (3).

The Assistant State's Attorney, as in the case of Roll, promptly submitted a "Petition for Direct Contempt" to the Circuit Court for Montgomery County. Docketed as miscellaneous petition 4490, it was the same in substance as that filed as to Roll. Scholl was brought before the court immediately upon the termination of the proceedings with regard to Roll. A certificate that he had been sworn as a witness to testify before the grand jury was received in evidence. Mrs. Keys' testimony concerning Scholl's appearance was in substance the same as her testimony concerning Roll's appearance. The grand jury reporter then read into the record a transcription of the proceedings before that body involving Scholl. A copy of the transcription is in the record before us and reads as above summarized. The State rested. The court inquired of Scholl if he wanted to take the stand and "give any reason why you should not be held in contempt of the court for failure to testify before the grand jury after you had been promised immunity." Scholl requested a postponement so he could confer with his lawyer, Page Digman, who was not available at the moment. The court asked the State what it thought. The State thought it was simply a matter of whether or not Scholl would testify. It said Scholl had extensively consulted with Digman about testifying and if that was what he wanted to consult him about again, he was either going to agree to testify or not agree and that required no further consultation. It opposed the request. The court said it understood Scholl was then serving a three year sentence for revocation of probation, and upon being asked by the court Scholl said that he was serving the sentence at Maryland Correctional Center. The court said:

> "This is a direct contempt proceeding. It is in the discretion of the Court whether he grants counsel for you or not. I don't know what counsel could do for you, but he might do something. I doubt it."

It reaffirmed the grant of immunity which Scholl said

he understood. The court again asked if he wanted to take the stand to give reason why he should not be held in contempt. Scholl responded by requesting an answer to his question whether he could have the assistance of counsel on the charges. The court observed that no charges had been brought except the direct contempt. Scholl said that was what he meant, that "there is a good possibility that I will catch additional punishment." The court agreed: "I'm just afraid you will," but denied him "a continuance here to get counsel." It again asked Scholl if he desired to take the stand and Scholl said he would do so "momentarily." The court again explained the grant of immunity and Scholl said he understood. He then stated:

> "The major reason involved why I refuse to testify against these people is, if I testify against these people then it becomes aware and known to these people. My life will be directly in danger."

He realized the proceedings were secret but refused to testify before the grand jury "for that specific reason." He was excused. The court found him "in direct contempt of this Court." Sentence was imposed.

We have set out the contempt proceedings in such detail because we think that the lower court was in error in its conduct of them.

*The Law*

Contempts of court are classified in two categories, (1) direct or constructive,[12] and (2) civil or criminal. The categories are not mutually exclusive and contempts are usually classified in terms of both categories. So a contempt may be direct and civil, or direct and criminal, or constructive and civil, or constructive and criminal. Under what classification a contempt falls may be of the utmost importance, and if at times the proper classifica-

---

12. "Constructive" contempts are also known as "indirect" contempts. Blackstone called them "consequential" contempts. 4 *Commentaries on the Laws of England* 284.

tion is hard to come by, it is certain that the label the court or the State chooses to put upon a contempt is not conclusive of its character.

Subtitle P of the Maryland Rules of Procedure deals with "Contempt." Rule P1 a defines a direct contempt to mean "a contempt committed in the presence of the court, or so near to the court as to interrupt its proceedings." Rule P1 b defines a constructive contempt as one committed otherwise. The subtitle spells out the procedure to be followed with respect to a direct contempt, Rule P3 and with respect to a constructive contempt, Rule P4. Rule P2 a makes the Subtitle applicable to both civil and criminal contempts.

As direct contempts are those which occur in the presence of the court or so near to the court as to interrupt its proceedings, the judge is usually an observer of or has personal knowledge of the facts. So Rule P3 b requires, where a direct contempt is committed, that the court sign a written order to that effect in which the facts are recited with a designation as to which facts were known to the court of its own knowledge and, as to any not so known, the basis for the court's finding with respect thereto. Such an order is necessary because a direct contempt may be punished summarily by the court against which the contempt was committed, Rule P3 a, and the order enables the appellate court to determine from the record whether a contempt has been committed and whether the court had jurisdiction to punish it. *Kandel v. State*, 252 Md. 668.

Constructive contempts may not be summarily punished by the court. As they are contempts which are not committed in the presence of the court, or so near as to interrupt its proceedings, the court would not be a personal observer of the facts. Thus Rule P4 a provides that although constructive contempt proceedings may be instituted by the court of its own motion, they may also be instituted by the State's Attorney or by any person having actual knowledge of the alleged contempt. A person cited for constructive contempt is entitled to show

cause within a stated time why an order adjudging him in contempt shall not be issued, to a hearing after notice of its time and place, to a reasonable time for the preparation of his defense, to a statement of the facts constituting the contempt charged, and to be served with a copy of any writing or document filed in support of the alleged contempt. These matters shall be set out in an order issued by the court determining to cite the person for contempt and the order shall be served on such person pursuant to the rules regarding service of process (Rule 104) unless the person has appeared as a party in the action in which the contempt is charged, in which case service shall be in the manner prescribed by the court. Rule P4 b 1 (a) (b) (c) and 2. Further, unless the alleged contemnor otherwise consents, the judge who issued a citation for constructive contempt shall be disqualified from presiding at the hearing except where such contempt consists of failure to obey an order or judgment in a civil case. Rule P4 d 2.

We observe that in criminal contempts, both direct and constructive, where the sentence imposed is not petty, that is the sentence imposed is 6 months or more,[13] the alleged contemnor is entitled to a trial by jury, thus restricting, in the case of direct criminal contempts, the power of the court to inflict punishment summarily. This right was reached through three cases. *Cheff v. Schnackenberg,* 384 U. S. 373 held, under the supervisory power over the federal courts rather than on constitutional grounds, that when the punishment in a criminal contempt was more than a petty sentence, the federal courts were required to grant a jury trial. *Duncan v. Louisiana,* 391 U. S. 145 held that the sixth amendment right to a jury trial for serious offenses applied to the states through the fourteenth amendment. In *Bloom v. Illinois,* 391 U. S. 194, the Court concluded, departing from its holding in *United States v. Barnett,* 376 U. S. 681, although forecast by

---

13. If there is a maximum sentence of six months or more authorized by the legislature the defendant would be entitled to a a jury trial regardless of the sentence actually imposed.

dictum in note 12 at 695 thereof, that the constitution did require a jury trial in contempt cases where the sentence was more than petty.

*The Application of the Law*

The lower court proceeded on the predicate that the refusal of Roll and Scholl to testify before the grand jury constituted the commission by each of them of a direct contempt. It punished them summarily under the authority of Rule P3 a, and as to each it issued an order in compliance with Rule P3 b designating that the contempt was direct, finding each guilty "of direct contempt of court," reciting the facts, and entered of record over the signature of the judge. The question is whether the refusal of Roll and Scholl to testify was, in the facts and circumstances, a direct contempt against the court so punishing them summarily.

An Editor's note to Rule P3 states that the language of §§ a and b was largely derived from Federal Criminal Rule 42 (a), entitled "Summary Disposition" and dealing with criminal contempts, and New Jersey Civil Rule 4:87-1. In *Harris v. United States*, 382 U. S. 162, 164 the Court observed that "Rule 42 (a) was reserved 'for exceptional circumstances', *Brown v. United States*, 359 U. S. 41, 54, 79 S. Ct. 539, 548 (dissenting opinion), such as acts threatening the judge or disrupting a hearing or obstructing court proceedings. *Ibid.* We reach that conclusion in light of 'the concern long demonstrated by both Congress and this Court over the possible abuse of the contempt power,' ibid., and in light of the wording of the Rule. Summary contempt is for 'misbehavior' (*Ex parte Terry*, 128 U. S. 289, 314, 9 S. Ct. 77, 83, 32 L. Ed. 405) in the 'actual presence of the Court.' Then speedy punishment may be necessary in order to achieve 'summary vindication of the court's dignity and authority' *Cooke v. United States*, 267 U. S. 517, 534, 45 S. Ct. 390, 394, 69 L. Ed. 767." Even if "presence" as used in Rule P1 a in defining direct contempt is considered a word of art, we do not think that the refusal to testify before the grand jury was in the "presence" of the lower court

within the contemplation of the definition, nor do we think it may be deemed in any way as interrupting the lower court's proceedings. Speedy punishment was not here necessary in order to achieve summary vindication of the court's dignity and authority and delay necessary for compliance for a proper hearing after reasonable notice would not have imperiled the grand jury proceedings.[14] Blackstone in his *Commentaries on the Laws of England,* Book the Fourth, at 283-284 refers to direct contempts as those "which openly insult or resist the powers of the courts, or the persons of the judges who preside there." It is patent that a witness commits a direct contempt when he refuses to answer a question when ordered to do so in the course of a trial. See *Brown v. United States,* 356 U. S. 148. But here neither Roll nor Scholl were ordered by the court to answer questions before the grand jury. Each was asked by the court numerous times if he wanted to testify but was never under an express order of the court to do so. We believe that any contempt committed was before the grand jury where the refusal to testify in fact occurred. We observe that § 298 (c), as we have pointed out, makes the refusal to testify concerning controlled dangerous substances a contempt. This aspect distinguishes the statute from other immunity statutes, for example Code, Art. 27, § 23 pertaining to bribery and § 262 pertaining to gaming, which only provide that a person is a compellable witness. So under § 298 (c) an order of court is not required to make the refusal to testify a contemptuous act, the mere refusal by the terms of the act being sufficient, but under §§ 23 and 262 where the witness is only designated as "compellable" there must be some order of the court to compel him in fact to testify which is disregarded by the witness to make his refusal to testify contemptuous. As to Roll and Scholl the only orders issued under the author-

---

14. In fact the same day Roll and Scholl refused to testify the grand jury returned an indictment against Ingram, Ingram and Yendell presenting violations of the controlled dangerous substances laws.

ity of the court were the summons as to Roll and the writ as to Scholl and they commanded appearance before the grand jury. Their respective appearance before the grand jury complied with the command. Therefore if the refusal to testify was contemptuous, it could only be because the statute so provided, and not because either disobeyed a direct order of the court.[15] But even if Roll and Scholl had been under a direct order of the court to testify before the grand jury we do not think that the refusal to comply with the order would justify the classification of a direct contempt. In *Harris v. United States, supra,* the petitioner was a witness before a grand jury and refused to answer certain questions on the ground of self-incrimination. He and the grand jury were brought before the District Court which directed him to answer the questions propounded before the grand jury, stating that petitioner would receive immunity from prosecution. He refused again to give any answers to the grand jury. Thereupon he was brought back before the District Court and sworn. The District Court repeated the questions and directed petitioner to answer, but he refused on the ground of privilege. The majority opinion of the Supreme Court stated, at 164-165:

> "The real contempt, if such there was, was contempt before the grand jury—the refusal to answer to it when directed by the court. Swearing the witness and repeating the questions before the judge was an effort to have the refusal to testify 'committed in the actual presence of the court' for the purpose of Rule 42 (a). It served no other purpose, for the witness

---

15. We understand it is a customary procedure in Maryland that upon refusal of a witness to testify before the grand jury the entire grand jury and the witness appear before the court. The court orders the witness to testify. The grand jury, to observe the requirements of secrecy, then retire with the witness. If he is adamant in his refusal to testify the entire grand jury and the witness again go before the court and the jury inform the court what occurred. The court may then cite the witness for contempt. Whether it may attach the witness summarily depends, as this opinion indicates, on other considerations.

had been adamant and had made his position known. The appearance before the District Court was not a new and different proceeding, unrelated to the other. It was ancillary to the grand jury hearing and designed as an aid to it."

Much of what was thus said in *Harris* applies with equal force to the proceedings here. We think that if the facts in *Harris* would not support a finding that the contempt was in the presence of the court, certainly the facts here would not. For Roll and Scholl were brought before the Court, not to have the court direct them to answer, but to determine the State's petition to have them declared in direct contempt of court for refusing to testify before the grand jury. The act of refusing to testify had already been committed, not before the court but before the grand jury, and the court was merely being called upon to decide whether or not the acts were contemptuous.

There is a further consideration in our inquiry as to whether the contempts committed by Roll and Scholl were direct *vel non*. Although it has been held that the right to punish for contempt by summary conviction is a power inherent in all courts of justice, and essential for their protection and existence, see *Goldsborough v. State*, 12 Md. App. 346, the legislature has expressed its intention to restrain the courts from so punishing except for designated acts. Code, Art. 26, § 4 provides, in pertinent part, that "[t]he power of the several courts of the State to * * * inflict summary punishments for contempt of court shall not be construed to extend to any cases except:

'(1) The misbehavior of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice;

(2) the misbehavior of any officers of the said courts in their official transactions;

(3) the disobedience or resistance by any officer

of the said courts, party, juror, witness or any other person or persons to any lawful writ, process, order, rule, decree or command of the said courts; * * *.' "

Case (2) is not applicable by its terms. Certainly there was no "misbehavior" by either Roll or Scholl within the contemplation of case (1). And as we have seen there was no disobedience or resistance by them to any lawful order of command of the court.

We conclude that the refusal of Roll and Scholl to testify before the grand jury under the facts and circumstances existent did not constitute as to either a direct contempt of court.[16] The contempts, if such there were, were constructive contempts. Therefore the procedures to be followed by the court were as mandated by Rule P4, which requires observance of rights generally included in the amorphous bundle called "due process of law."[17] See *Reamer v. Reamer*, 246 Md. 532. Roll and Scholl were not afforded their rights as intended by Rule P4. We hold that the hearings violated due process of law. The orders emanating from the hearings must be reversed.

## The Sentences

We think it advisable to discuss the sentences imposed.

## Roll's Sentence

The sentence imposed on Roll, as announced in open court immediately upon the finding that he was contemptuous, was that "you be sentenced to and committed to the Montgomery County Detention Center until you purge yourself of the contempt." The sentence as it was de-

---

16. We assume arguendo, but do not decide, that Rule P3 and Art. 26, § 4 reach testimonial episodes.

17. In the discussion of the contempt power in 11 Arizona Law Review, 501, etc., *supra*, note 1, it is pointed out that the rights to notice, hearing and counsel have historically been accorded to contemnors whose offense has been classified as an indirect (constructive) contempt. At least since 1925 they have had a constitutional basis, see *Cooke v. United States*, 267 U. S. 517, and had their roots in the common law as announced by Blackstone, who was cited by Chief Justice Taft several times in the *Cooke* opinion.

clared in a written order issued by the court and filed the next day was that he "be confined in the Montgomery County Detention Center until he purges himself of the said contempt by testifying [before] the Grand Jury in the Presentment for which he was called." This punishment was coercive as distinguished from punitive. It was remedial, the purpose being to compel obedience to the command of § 298 (c), clearly directing, although expressed in the negative, that a person testify concerning controlled dangerous substances violations when called upon to do so. Thus, unlike the determinate term of a punitive sentence, Roll's sentence was indeterminate. He, as has been said, carried the keys to the prison in his pocket, the sentence contemplating that he could unlock the door when he chose to purge himself of his contemptuous act by testifying. Therefore the sentence must be considered in the frame of reference of Roll's ability so to purge himself if he desired to do so. First, it is patent that upon the discharge of the grand jury involved he could no longer testify before it even if he then chose to do so. Therefore the sentence could be in effect only so long as the grand jury for Montgomery County for the October Term of 1971 was in existence. See Code, Art. 51, § 21. When it was finally discharged at the conclusion of its term he would have to be released. Otherwise he would remain incarcerated for the balance of his natural life because it would be impossible for him to purge himself of the contempt by testifying. We do not believe such a harsh result was intended by the lower court and, in any event, such a sentence would be cruel and unusual. In Montgomery County by Rule 3 a of the *Court Rules —Sixth Judicial Circuit of Maryland,* "There shall be two terms of Court; the first beginning on the first Monday of March of each year and the second beginning on the first Monday of October of each year." By the provisions of the plan for random selection of juries submitted by the Circuit Court for Montgomery County in compliance with Code, Art. 51, § 4, and approved by the Court of Appeals on 9 September 1969, the terms of the grand

jury for that county coincide with the terms of the Circuit Court for Montgomery County. So the term of the grand jury with which we are here concerned terminated on 5 March 1972, the term for the grand jury selected for the March Term 1972 beginning on Monday, 6 March 1972. Thus Roll could not in any event be held after 5 March 1972 on the contempt sentence imposed. But we must look further. It is abundantly clear that Roll was summoned to appear on 20 October 1971 as a witness concerning the deliberation of the grand jury on a presentment before it involving the Ingrams and Yendell during a particular period as to their activities relating to controlled dangerous substances. During the contempt proceeding when the court asked the prosecutor what he thought about Roll's request for the assistance of counsel, the prosecutor said: "If the defendant is requesting an opportunity to have himself represented by counsel at this proceeding, of course the State has no objection to that. We would merely state this for the record, however: The grand jury presently has this presentment under consideration. The State is going to ask them to deliberate on that presentment today." It was clear the State objected to any continuance. We can only conclude that Roll's testimony was sought on the presentment being considered by the grand jury against the Ingrams and Yendell and their unlawful activities at the Dublin Drive house and that the sentence imposed at the contempt proceeding was to coerce this testimony. It provided, as has been stated, that Roll would be confined "until he purges himself of the said contempt by testifying [before] the Grand Jury *in the Presentment for which he was called.*" (emphasis added). However, the same day, 20 October 1971, the grand jury returned the presentment and filed a true bill in the court, charging the Ingrams and Yendell with the offenses concerning which Roll's testimony was desired. As we see it, upon the return of the indictment the matter about which Roll's testimony was sought was no longer before the grand jury; "the Presentment for which he was called" had been removed from their con-

sideration. The indictment had been found without his testimony and even if Roll thereafter agreed to testify, the subject of his testimony was no longer of concern to the jury. On the record before us the grand jury was not conducting a general investigation but was inquiring for the purpose of an express presentment about specific activities of designated persons during a certain period, and the provisions of the sentence so reflected. We observe that according to the docket entries of the lower court Michael Lawrence Ingram and Helen Marie Ingram each pleaded guilty to possession of controlled paraphernalia and possession of controlled dangerous substances when the indictment came up for trial on 18 November 1971. The pleas were accepted and on 31 January 1972 they were sentenced. Yendell pleaded guilty under the indictment on 8 December 1971 and the imposition of sentence as to him is awaiting a pre-sentence investigation. We feel in the light of all the circumstances that the coercive purpose of the sentence imposed disappeared when the grand jury returned the indictment, that the sentence was remedial and not punitive, that upon return of the indictment there was no remedy required for the refusal to testify and that therefore it was not possible for Roll then to comply with the provisions of the sentence relating to him purging himself, the presentment for which he was called no longer being before the grand jury.[18] It seems that a rehearing as to Roll to determine whether he committed a civil constructive contempt would serve no purpose.

*Scholl's Sentence*

The sentence imposed upon Scholl as announced in open court immediately upon the finding that he was contemptuous was that "you be delivered to the Commis-

---

18. We note that had Roll's testimony been required by the State at the trial of Ingram, Ingram and Yendell the State could have put him on the stand and called for his testimony on pain of contempt. We observe that upon testifying Roll would have received immunity whether or not he expressly claimed it because the immunity provisions of § 298 (c) are self-executing.

sioner of Correction for confinement for a period of two years; that the sentence of two years run consecutively to the sentence which you are now serving. Provided, however, that if you will agree forthwith to testify before the grand jury the Court will suspend execution of the sentence; provided you purge yourself by testifying before the grand jury." [19] There is no question but that this sentence was punitive. It was for a fixed term, it was to run consecutive to a sentence then being served, and its execution was subject to being suspended upon condition, not unusual in a sentence imposed in any criminal cause. In the order issued by the court and filed the next day, 22 October 1971, the sentence was declared to be that Scholl "be delivered to the Commissioner of Corrections for confinement for a period of two years, this sentence to run consecutive to the sentence which he is now serving. In the event, however, that the defendant purges himself of the said contempt by testifying before the Grand Jury in the Presentment for which he was called, the sentence given herein shall be suspended." This sentence, the same in effect as that announced in court, was also punitive. However, on 22 October the court issued an order "modifying and revising" the sentence. It read:

> "It is the sentence of the Court that you, William Edward Scholl, be delivered to the custody of the Commissioner of Corrections for confinement for a period of four (4) months and sixteen (16) days, this said sentence to run consecutive to the sentence you are now serving in the Maryland Correctional Institute.

> It is further

> ORDERED that the sentence given herein be suspended provided you purge yourself of your

---

19. The court told the guard called to take custody of Scholl: "I gave him an additional two years to what he was serving, to run consecutively. You will deliver him back to Hagerstown. You can wait until I draft the order."

direct contempt of Court by testifying before the Montgomery County Grand Jury appointed on October 4, 1971, with promise of immunity from prosecution, on or before March 6, 1972."

It would seem that the 4 months and 16 days was arrived at so that the termination of the sentence would coincide with the termination of the term of the grand jury before which Scholl appeared; in other words 4 months and 16 days from 20 October 1971 would fall on 6 March 1972. But if this was the intent, the order did not accomplish it for it specified that the sentence was to run consecutive to that which Scholl was then serving. It was adduced at the contempt proceeding that he had been sentenced to 3 years and he said he had served 6 months. Thus he would not start to serve the 4 months and 16 days until all the time, less adjustments provided by law, had been served on the 3 year sentence. The execution of the contempt sentence would be suspended only if Scholl testified before the October Term 1971 grand jury "on or before March 6, 1972." [20] If he did not testify within the required time, the contempt sentence would have to be served in the future despite the fact that it was no longer possible for Scholl to purge himself. The basic nature of this sentence, like that of the one it replaced, clearly was punitive. But we are again faced with the question whether it was at all possible for Scholl to purge himself within the contemplation of the sentence. We assume that the lower court intended that Scholl testify, as was set out in the prior order, "in the Presentment for which he was called." [21] It is clear that the presentment for

---

**20.** It is not clear that the grand jury appointed 4 October 1971 would be in existence on Monday, 6 March 1972 as the new grand jury would be appointed on 6 March.

**21.** Unlike the former written order the revised order did not designate the subject matter of the testimony to which Scholl could testify in order to purge himself. Conceivably any testimony he gave before the jury would purge him. But we make the assumption because we think the only rational inference to be drawn from the facts and circumstances is that the lower court meant the testimony to relate to the presentment concerning which Scholl had been summoned to appear.

which he was called concerned the activities of the Ingrams and Yendell during a certain period. This was to be the scope of the questions, nothing further. For like reasons to those advanced in the discussion as to Roll, when the true bill regarding the Ingrams and Yendell was returned by the grand jury on 20 October 1971 there was no longer any matter before it concerning which Scholl had been summoned to testify. Therefore he could not purge himself of his contemptuous act, if the refusal to testify was a contempt of court, thereafter. But since his punishment was punitive and not coercive, the effect as far as he was concerned was that the condition of suspension of the execution of his sentence could not be fulfilled. Thus he would have to serve 4 months and 16 days following the completion of the sentence he is currently serving. However, the imposition of a sentence punitive in nature had another effect; it made the contempt a criminal contempt and the proceeding with respect thereto a criminal proceeding. "The line of distinction between civil and criminal contempt is often indistinct. Often the same acts or omissions may constitute both or at least embrace aspects of each." *Sheets v. City of Hagerstown,* 204 Md. 113, 120.[22] In *Kelly v. Montbello Park Co.,* 141 Md. 194, after discussion in depth, the Court arrived at a simple standard test. As stated in *Tyler v. Baltimore County,* 256 Md. 64, 71, it is "if the contempt order is coercive in order to remedy the contemptuous act or omission, the contempt was civil, if it is punitive the contempt was criminal." So the sentence in a criminal contempt is a determinate one while in a civil contempt the contemnor, as we pointed out *supra,* carries the keys to the prison in his pocket—compliance with the court's command effects his release. Theoretically the court could impose both a punitive and coercive sentence simultaneously but practically there would be little coercion presented by an indeterminate sentence while the determi-

---

22. A practical illustration of the confusion existing in distinguishing civil and criminal contempts is found in *Shillitani v. United States,* 384 U. S. 364, 369. See *Cheff v. Schnackenberg,* 384 U. S. 373, 383, n. 4.

nate sentence was still in effect. If the court did so, however, the contempt procedure would be both criminal and civil in nature. This is so for the reason that the classification is not predicated on the act of contempt but is based on the sentence. And we think the better rule is that if any part of the contempt sentence is punishment, the contempt must be classified as a criminal one.[23]

We conclude that if further proceedings are to be pursued against Scholl he is entitled to have those proceedings conducted with due observance of the rights accruing to him as in any criminal trial.[24] We note, however, that upon a finding on retrial that he committed a contempt, the court would not be authorized to impose a sentence greater than that originally imposed, namely 4 months 16 days to run consecutively to the sentence he is now serving, except as permitted under the rule in *North Carolina v. Pearce,* 395 U. S. 711. See *Cherry v. State,* 9 Md. App. 416.

## MOTIONS TO STRIKE PORTIONS OF AFFIDAVIT FILED

On 13 December 1971 there was filed in each of Roll's case and Scholl's case an affidavit of Jeffrey Russell Werner, the Assistant State's Attorney concerned, each made 13 December 1971 setting out certain facts and information relating to the alleged contempt. The affidavit was

---

23. The punishment-oriented criterion may be criticized as difficult to apply at the threshold. It does force the lower court as a practical matter to decide the type of punishment to be imposed, that is whether coercive or punitive, before proceeding with the determination of the fact of the commission of a contemptuous act. A determinate criminal sentence may not be imposed upon a civil contempt hearing. *Gompers v. Bucks Stove & Range Co.,* 221 U. S. 418. But it seems that the facts and circumstances of the act within the knowledge of the court, or as alleged, would be adequate to enable the court to make such decision. And if the court is in doubt as to the nature of the punishment it would desire to impose upon proof of the contemptuous act, it could conduct the proceedings as if it were to impose punitive punishment. We see no substantial difference in this than in trials of offenses as to which no maximum penalty is fixed where the court is "in the position of taking at least a peripheral view of the case, and deciding, before hearing it, whether the offense is serious or petty" so as to ascertain whether or not the defendant is entitled to a jury trial. *In re Martin,* 10 Md. App. 385, 387.

24. As to right to jury trial see *Bloom v. Illinois,* 391 U. S. 194.

62

made and filed some two months after the findings that the appellants had been contemptuous and sentences imposed, and subsequent to the notings of appeal from those judgments. The records were received by this Court on 14 December 1971. Roll and Scholl each moved to strike certain portions of the affidavit. The State opposed the motion. We deferred determination thereon until argument on appeal. The affidavits were not considered by us in deciding the cases. Whether the affidavits were within the contemplation of Rule P 3 c (3), whether they were properly received by the court below, and whether they are properly part of the record before us we need not determine. To keep the record straight we grant the motions. We order that paragraphs 4, 5, 6, 7 and 8 of the affidavit as to Roll be stricken and that paragraphs 5 and 6 of the affidavit as to Scholl be stricken.

> *In Appeal No. 578, Miscellaneous Petition No. 4489 below, order of 21 October 1971, holding Daniel T. Roll in Direct Contempt of Court and imposing sentence, reversed; costs to be paid by the County Council of Montgomery County.*
> *In Appeal No. 579, Miscellaneous Petition No. 4490 below, order of 21 October 1971, holding William Edward Scholl in Direct Contempt of Court and imposing sentence, and order of 22 October 1971, modifying and revising the sentence, reversed; case remanded for further proceedings.*[25]

---

25. Scholl prosecuted his appeal as an indigent by order of the lower court of 11 November 1971.