## JAMES VICTOR ROBINSON *v.* STATE OF MARYLAND

[No. 7, September Term, 1973.]

*Decided August 22, 1973.*

---

The cause was submitted on briefs to GILBERT, MENCHINE and SCANLAN, JJ.

Submitted by *Norman N. Yankellow* for appellant.

Submitted by *Francis B. Burch, Attorney General, James L. Bundy, Assistant Attorney General,* and *Milton B. Allen, State's Attorney for Baltimore City,* for appellee.

SCANLAN, J., delivered the opinion of the Court.

The appellant, James Victor Robinson, was summarily convicted of a criminal contempt committed in the presence of the court by Judge Charles D. Harris of the Criminal Court of Baltimore who sentenced him to six months in jail. The question presented on Robinson's appeal from the lower court's order is whether it erred in finding him in contempt.

On July 7, 1972, the appellant was arrested and charged with kidnapping. He was committed to the Baltimore City Jail where he remained both before and after the return of an indictment on August 16, 1972. While in jail, he filed in the court below what purported to be a "Petition for Writ of Certiorari" but was actually a habeas corpus petition,

complaining that he was being "illegally restrained of his liberty by the Warden of the Baltimore City Jail." [1]

On November 17, 1972, Nelson Kandel, Esq., entered his appearance as counsel for the appellant. On that same day, a hearing was held before Judge Harris on the appellant's petition. The following then transpired:

> "MR. KANDEL: It is the contention of the relator, I of course agree with him, that there is no necessity for a trial. Even in the Police reports it's exculpatory. However, I am aware that the Grand Jury has indicted him and I have also contacted the State's Attorney and indicated the same thing I have just proffered to the Court, and the State's Attorney has set it in for January 8th before Judge Cole in Part 7. However, Mr. Robinson, who has been in jail since June of 1972, is at a loss to explain to the delay. Is that about it?
>
> "MR. ROBINSON: No. There is nothing in here to constitute an arrest. There is nothing in here that the Grand Jury should have accepted.
>
> "THE COURT: I'm not arguing.
>
> "MR. ROBINSON: I'm not arguing with you either. Are you familiar with this?
>
> "MR. KANDEL: No we can't —
>
> "MR. ROBINSON: Well make him familiar with it, read it to him.
>
> "THE COURT: Mr. Kandel, you had better take your client and —
>
> "MR. KANDEL: Your Honor, what Mr. Robinson wants me to tell you is there is not a scintilla of evidence, there is no evidence at all that involves him with the crime. We have discussed this. I agree with everything he contends. However, I have explained to him that a Court and the Judge that

---

1. Although the record is sufficient for purposes of determining the issue presented on this appeal, it does have gaps. For example, the petition which the appellant filed seeking his release from jail is omitted.

hears the case when it's called for trial would have to make this determination and no other Judge could make this determination since the Grand Jury has indicted him. We both have gone over this and Mr. Robinson I believe understands it.

"MR. ROBINSON: No, I don't.

"MR. KANDEL: Your Honor, I have nothing further to say in this regard because there is nothing further that can be said at this point. I believe in his innocence and he believes in his innocence and I believe it can be established at the trial. He's getting impatient for trial.

"THE COURT: On the basis of the statements made thus far I find no legal reason for the issuance of a writ of habeas corpus and the application will be denied.

"MR. ROBINSON: I wasn't under the impression you called me for a writ of habeas corpus. Have you read the police report? Go away, what are you talking about, Mr. Kandel.

"THE COURT: Mr Robinson, I find you in contempt of court and sentence you to six months dating from today."

Pursuant to Article 26, Section 4 of the Code and Rule P3 b of the Rules of Procedure, the trial court then prepared and filed a written order of contempt. In pertinent part, the order states that:

"The defendant in the above indictments filed a petition in this Court on October 26, 1972, alleging that he was 'illegally restrained of his liberty by the Warden of the Baltimore City Jail', and prayed that a writ of *habeas corpus* issue for his release. A hearing was held on said petition in open court on November 17, 1972, at which time the defendant was represented by his attorney, Nelson R. Kandel, Esq. The Court was informed by Mr. Kandel that a date had been set for the trial of the above indictments, and as the Court found that no valid

ground had been alleged or shown for the issuance of the writ of *habeas corpus*, the Court denied the petition for such writ. The defendant then became insolent, threatening, and uncontrolable in his behavior to both the Court and his counsel, and further exhibited such behavior as to obstruct the administration of justice and to interfere with the dignity and decorum of the Court, whereupon the Court found the defendant, after unheeded admonitions to him, to be guilty of direct contempt of court, and imposed a sentence of six months' imprisonment from November 17, 1972."

A contempt committed in the presence of the court was an offense at common law and the right to punish its commission was inherent in all courts. *Ex Parte Terry*, 128 U. S. 289, 303 (1888); *Ex Parte Maulsby*, 13 Md. 625, 635 (1859). The judicial power to punish for a direct contempt has been codified in Article 26, Section 4 of the Ann. Code of Maryland (1973 Repl. Vol.). That Section, however, is merely declaratory of the several categories of actions which constitute a direct contempt. *Goldsborough v. State*, 12 Md. App. 346, 354, 278 A. 2d 623 (1971); and *see Weaver v. State*, 244 Md. 640, 644, 224 A. 2d 684 (1966). Among the direct contempts enumerated in Article 26, Section 4, is "the misbehavior of any person or persons in the presence of said courts, or so near thereto as to obstruct the administration of justice . . . ." It was such a direct contempt of which Judge Harris found the appellant guilty.

In determining whether the appellant's actions before the trial judge amounted to a criminal contempt punishable by a six months jail sentence, we take into account the often expressed admonition "that a summary contempt proceeding should be the exceptional case." *State v. Roll*, 267 Md. 714, 298 A. 2d 867, 878 (1973), *affirming Roll v. State*, 15 Md. App. 31, 288 A. 2d 605 (1972). The right to punish for a direct criminal contempt by summary conviction is a power that is essential to the protection and existence of courts of justice. *Muskus v. State*, 14 Md. App. 348, 358, 286 A. 2d 783 (1972); *Goldsborough v. State, supra* at 354. Nevertheless,

the limits of that power are the "least possible power adequate to the end proposed." *Harris v. United States*, 382 U. S. 162, 165 (1965). Courts are constrained to remember that the power "to immediately or summarily hold a person in contempt is awesome and abuses of it must be guarded against." *State v. Roll, supra* at 732; *see Bloom v. Illinois*, 391 U. S. 194, 202 (1968) and cases cited therein. In our opinion, that "awesome" power was abused in this case and the appellant's conviction must be vacated.

Rule P3 b provides that:

> "Where a direct contempt is committed, the court shall sign a written order to that effect. *The order shall recite the facts*, be signed by the judge and entered of record. The order shall state which of the facts were known to the court of its own knowledge and as to any facts not so known, the basis for the court's finding with respect thereto." (Emphasis added.)

According to the draftsmen of Maryland Rule P3 b,[2] its language was derived from Federal Rule 42 (a) of the Federal Rules of Criminal Procedure which states that:

> "A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record."

The requirement of Rule 42 (a) that a summary "order of contempt shall recite the facts" is more than a formality. "It is essential to disclosure of the basis of decision with sufficient particularity to permit an informed appellate review." *Tauber v. Gordon*, 350 F. 2d 843, 845 (3rd Cir. 1965). Similarly, the purpose of Rule P3 b in requiring the contempt order to "recite the *facts*" which constitute the alleged contempt is to enable an appellate court to determine, by an inspection of the record, whether a

---

2. State v. Roll, *supra* at 880, n. 17.

contempt has in fact been committed. (Emphasis added.) *Kandel v. State*, 252 Md. 668, 670, 250 A. 2d 853 (1969). In addition to its observance in Maryland and in the federal system, it is also the majority position in other jurisdictions that an order or judgment of direct contempt must contain a statement of the facts on which the decision is based, the purpose being to enable an appellate court to determine by an inspection of the record, whether a contempt has in fact been committed and whether the court had jurisdiction to punish it. *Necessity and Sufficiency of Making and Recording Subsidiary or Detailed Findings Supporting Adjudication of Direct Contempt*, 154 A.L.R. 1227, 1228 (1945). *See, e.g., Alexander v. Sharpe*, 245 A. 2d 279, 288 (Me. 1968). The requirement is rooted in due process considerations. *Ibid.*

In determining whether an order of contempt sufficiently sets forth the facts giving rise to the claimed contempt, conclusionary language and general citations to the record will not suffice; the specific facts constituting the contempt must be set out in the order. *United States v. Marshall*, 451 F. 2d 372, 375 (9th Cir. 1971); 154 A.L.R., *supra* at 1238-1249; and *see Alexander v. Sharpe, supra.*

We too have applied the requirement that specific *facts*, not mere judicial conclusions, must be stated in a contempt order before a person can be deprived of his liberty upon a summary conviction for direct contempt. In *Muskus v. State, supra*, this Court reversed a summary contempt conviction of an attorney where a trial judge's contempt order stated that Muskus "was arrogant and wilfully disobedient through the entire trial . . . ." *Id.* at 361. The trial judge's order, however, failed to delineate or specify the instances of arrogance or wilful disobedience to which he had made reference. Our examination of the record in *Muskus* justified a conclusion contrary to that reached by the trial judge regarding the defendant's conduct before the court. In reversing the conviction, this Court said: "We do not think that Judge DeBlasis' *general and unparticularized statement* that Muskus was arrogant and wilfully disobedient" supported his order finding the latter in contempt. *Ibid.* (emphasis added).

The contempt order entered by the trial judge in the instant case stated that:

> "The defendant then became insolent, threatening, and uncontrolable in his behavior to both the Court and his counsel, and further exhibited such behavior as to obstruct the administration of justice and to interfere with the dignity and decorum of the Court, whereupon the Court found the defendant, after unheeded admonitions to him, to be guilty of direct contempt of court."

As in *Muskus, supra,* the court's conclusionary language is not supported by any specification of the particular facts on which it purportedly rests. In addition, the transcript of the proceedings leading up to the trial judge's summary finding that appellant was in contempt also falls short of a demonstration that the appellant was "insolent, threatening and uncontrolable in his behavior." The record does suggest that the defendant, who protested his innocence of the charges against him, apparently harbored the mistaken belief that the proceedings in the court below were for the purpose of determining his guilt or innocence. He was wrong of course. Still, appellant's mistaken belief of the nature of the proceedings may help explain some of his remarks before the court, the majority of which were directed at his own attorney and not the trial judge. In that regard, we note that in *Goldsborough v. State, supra,* we reversed the summary contempt conviction of an attorney for a statement made in his opening argument which the trial judge had interpreted as a deliberate attempt to prejudice the State's right to a fair jury trial. In reversing, we observed that if the remark was made "under an honestly entertained, though mistaken, view of the law, the fact alone that it may have tended to prejudice the State's case would not, without more, constitute contempt." *Id.* at 357.

Proof in a direct contempt case must be shown beyond a reasonable doubt. *Id.* 358; *see Bloom v. Illinois,* 391 U. S. 194 (1968). We do not think that standard has been met here. The trial judge's contempt order states conclusions but does

not specify the facts allegedly giving rise to appellant's contempt in the presence of the court. Moreover, the trial judge's statement that he found the appellant guilty of contempt only "after unheeded admonitions to him" is not borne out by the transcript. A careful reading of it indicates only one statement on the part of the court which could be construed as an admonition to the appellant and that was a remark which the court made to appellant's counsel, *i.e.*, "Mr. Kandel, you had better take your client and —." We do not imply that judicial admonitions are a condition prerequisite to a summary finding of contempt in every case. Sometimes the contempt will have been committed without any prior opportunity for the court to have cautioned the contemnor concerning the consequences of his conduct. Generally, however, an admonition should precede judicial resort to the drastic power of summary contempt. In any event, the record in this case shows that the trial judge was mistaken in believing that he acted only after "unheeded admonitions" to the appellant.

In concluding that the transcript does not support the trial court's finding that a contempt had been committed we are not unaware that there are limitations to what a court reporter may transcribe in particular situations. Thus, it may be in this case that the transcript does not reflect appellant's angry tone of voice, or a menacing demeanor, or possibly threatening or offensive gestures directed toward the court, any of which might have justified the trial judge in finding that the appellant was guilty of "insolent, threatening and uncontrollable behavior." Unfortunately, if such actions on the appellant's part did take place, they are not stated in the contempt order and, as a consequence, this Court cannot take notice of their occurrence. This only emphasizes the importance, as well as the necessity, of having the trial courts of the State carefully adhere to the mandate of Rule P3 b that a contempt order "shall recite the *facts*" constituting the contempt, and not be limited merely to the court's conclusions or characterizations concerning the contemnor's behavior. (Emphasis added.) This requirement is as much directed toward providing meaningful appellate review of a contempt conviction as it is aimed at

assuring procedural protection for the defendant. There will be occasions, and the instant case may have been one, where the transcript of the proceedings will not furnish a completely accurate recitation of the events which precipitated a summary conviction of contempt. It is the contempt order, therefore, to which appellate courts must look in order to ascertain the full facts. Accordingly, the trial courts should remember that to the extent a contempt order does not specify those *facts*, appellate review of a conviction for summary contempt will be *pro tanto* circumscribed.

In vacating appellant's conviction for contempt, we remain aware of the great provocation to which the trial courts are often subjected by the conduct of arrogant and insolent criminal defendants. Nevertheless, no man should be deprived of his liberty on the basis of judicial *ipse dixits* alone. To hold otherwise would be to ignore the language and clear purpose of Rule P3 b and flaunt due process.[3]

We said in *Muskus v. State, supra* at 361, that "while trial judges must be given wide latitude to punish contemptuous conduct, they must ever be on guard against confusing offenses to their sensibilities with obstructions to the administration of justice." That advice was not followed in this case.

> *Order of November 17, 1972 vacated; costs to be paid by the Mayor and City Council of Baltimore.*

---

**3.** The trial judge imposed a sentence of six months in jail, the absolute *maximum* which he could have given the appellant without affording him a jury trial. In Re Martin, 10 Md. App. 385, 387, 270 A. 2d 674 (1970), *cert. denied*, 403 U. S. 955 (1971). In that case, we stated that a petty offense, not requiring a jury trial, is one "punishable *by not more than six months imprisonment* and a $500.00 fine." (Emphasis added.) *See:* Duncan v. Louisiana, 391 U. S. 145, 159-161 (1968); Bloom v. Illinois, *supra* at 209-210; and Frank v. United States, 395 U. S. 147, 150 (1969). Subsequently, in Roll v. State, *supra* at 49, we said by way of a dictum that a non-petty offense is one "where the sentence imposed *is 6 months or more.*" (Emphasis added.) The Court of Appeals repeated the same dictum in State v. Roll, *supra* at 877, n. 11. Upon further reflection, we adhere to our original statement in In Re Martin, *supra.* Thus, the six months sentence imposed by the trial judge in this case without affording a jury trial went to the outer limit of, but still fell within, his sentencing discretion. A sentence of six months and *one* day, however, could not have been meted out without extending appellant his right to a jury trial. Frank v. United States, *supra.*