RANDOLPH JOSEPH HALL, JR. *v.* STATE OF MARYLAND

[No. 62, September Term, 1968.]

*Decided November 15, 1968.*

The cause was argued before MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*James W. Murphy (Alan H. Murrell* on brief) for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Joseph R. Raymond, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was found guilty generally by the court sitting as a jury in the Criminal Court of Baltimore under an indictment containing four counts charging violations of the lottery laws. He was sentenced to imprisonment for a term of 6 months and fined $1000, the sentence of imprisonment to be suspended upon payment of the fine and court costs. The sole contention on appeal from the judgment is whether there was probable cause for the issuance of a search warrant under the authority of which a search was conducted and articles seized thereby were received in evidence against the appellant at his trial.

Subsequent to the indictment of the appellant and prior to his trial, he filed a motion to quash the indictment.[1] At the trial on the merits, the lower court found that the warrant was "legally sufficient" and denied the motion.

The law relating to probable cause for the issuance of a search warrant is clear. When it is made to appear to a judge or justice of the peace of this State by a written application signed and sworn to by the applicant, accompanied by an affidavit containing facts within the personal knowledge of the affiant, that there is probable cause to believe that a crime is being committed by any individual or in a building within his territorial jurisdiction, and that evidence of the crime is upon the person or within the place to be searched, he may issue a search warrant. *Salmon v. State*, 2 Md. App. 513, 519; Md. Code, Art. 27, § 551.

> "Probable cause, which is less than certainty or demonstration but more than suspicion or possibility, is to be determined by the judge or justice who issues the warrant, and if a prudent and cautious man would be justified from the facts presented to show its existence in believing that the offense had been or was be-

---

1. It appears from the provisions of Md. Rule 729 that the proper procedure whenever property is claimed in a court to have been obtained by an unlawful search or seizure is to move for its suppression or exclusion. In the instant case we shall treat the motion to quash the indictment as a motion to exclude the property seized.

ing committed, the warrant properly may be issued. In making his determination this judicial, hypothetical, 'cautious and prudent man' may give consideration to the special significance which objects, happenings and individuals may have conveyed to the trained, experienced and knowledgeable police officers who apply for the warrant." *Henson v. State,* 236 Md. 518, 521.

When the question of probable cause for the issuance of the warrant comes before the trial court, its consideration of whether or not there was probable cause should be confined solely to the affidavit itself. *Smith v. State,* 191 Md. 329, cert. den. 336 U. S. 925; *Scarborough v. State,* 3 Md. App. 208. But it should be mindful, as we are when the question reaches us, of the observations so forcefully made by the Supreme Court in *United States v. Ventresca,* 380 U. S. 102. We summarized those observations in *Frey v. State,* 3 Md. App. 38, 45-46:

> "That the requirements of the Constitution are practical and not abstract, that search warrants must be tested and interpreted by magistrates and courts in 'a commonsense and realistic fashion,' that the preference to be accorded a warrant indicates that in a doubtful or marginal case a search under a warrant may be sustainable, where without one it would fail and that 'a grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting,' and finally that:
>
> 'This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. See *Aguilar v. Texas, supra* [378 U. S. 114, 12 L. Ed. 2d at 729]. Recital of some of the underlying circumstances in the affidavit is essential [as it is under the Maryland statute] if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However,

> where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States, supra,* at 270 [of 362 U. S.].' "

Although the law is clear, its application must necessarily be made on a case to case basis, as the facts stated in an affidavit accompanying the application for the warrant vary according to the circumstances of the particular case.

In the instant case the facts to show probable cause were based in the main part on the observations of an officer of the Baltimore City Police Department. It was stated in the affidavit that a complaint was received that violations of the lottery laws were being committed in Randy's Confectionery and in a 1963 blue Thunderbird automobile, Maryland license GR85-71. Randy's Confectionery, so designated by a sign on the front of the store, was a grocery store in the first floor of the premises 1436 Holbrook Street, Baltimore City located on the southwest corner of Holbrook and Oliver Streets. The officer "watched in the vicinity of said premises" on each of three days. On 6 November 1967 he arrived about 9:40 A.M. and remained about an hour. During this period seven men and eight women entered the store. Two of the women were carrying "small brown paper bags" when they entered but not when they left. About 10:28 A.M. a man, designated in the affidavit as the First Man, came out of the store, walked over to a 1963 blue Thunderbird, Md. license GR85-71 parked on the Oliver Street side of the store and was about to enter the car when a man, designated in the affidavit as the Second Man, walking across the street from the northwest corner of Holbrook and Oliver Streets, hollered to the First Man. The Second Man handed

the First Man "what appeared to be several slips of white paper and U. S. currency." The First Man entered the car and drove away. On 8 November the officer arrived in the vicinity of the store about 9:55 A.M. and remained about two hours. He saw nine women and eleven men enter the store at various times, remaining therein only a short time before leaving. About 10:25 A.M. the Second Man went into the store, came out "empty handed" in about two minutes, and walked away. About 11:00 A.M. the First Man came out of the store, walked to the same Thunderbird automobile which was parked on Holbrook Street near the store, looked up and down Holbrook Street for several minutes and reentered the store. About 11:50 A.M. two young boys about 8 or 9 years of age, one wearing a red hat, walked down Oliver Street from Aisquith Street. The affidavit then reads:

> "I overheard the young boy with the red hat ask the other boy 'Where are you going now?' The other youth replied down 'Randy's' store. The boy with the red hat then said, 'You told me you didn't have any money.' The other boy replied 'Miss Mary gave me a nickel to take her numbers down the store, so I am going back and get a bag of potato chips and I will give you some.' "

On 11 November the officer arrived in the vicinity about 10:00 A.M. and remained about an hour and three quarters. He saw eight women, six young girls, seven men and five young boys enter the store "on separate occasions." About 10:30 A.M. the Second Man entered the store after engaging in a brief conversation with one of the women as she was leaving the store. The Thunderbird previously observed was parked on Oliver Street beside the store during the entire period of observation. Upon inquiry of the Department of Motor Vehicles it was ascertained that the Thunderbird was titled in the name of Randolph H. Hall. The officer stated in the affidavit:

> "The lottery carried on and known as numbers requires that the play or slips be collected by certain people designated as runners or writers and then re-

turned to persons or corporations conducting the game, and it is the belief of the affiant, founded upon his experience with such violations, that the persons referred to herein are runners or writers and are actively engaged in the business of conducting a lottery."

The extent of the officer's experience was not set out.

Unusual numbers of persons going to and from the premises are circumstances which may be given weight in determining the existence of probable cause. *Wood v. State,* 185 Md. 280, 286. But here the suspect premises were not a private residence, but a store, characterized as a grocery store in the affidavit. The affidavit does not allege that a grocery business was not being conducted on the premises and that the store was not open to such persons who from time to time desired to buy the goods on sale. It cannot be ascertained from the affidavit if the number of persons the affiant observed enter the store was unusual for the lawful business being conducted or that they were other than *bona fide* customers of the grocery store. The affidavit does not disclose whether or not the persons leaving the store were carrying articles they may have purchased therein (except the Second Man was once seen leaving empty handed) and it cannot be assumed that they were not. Accepting the statement based on the experience of the officer (see *Fleming v. State,* 201 Md. 145) that the conduct of the numbers activities requires that slips be collected from players by writers and turned in to those in the next higher echelon of the business, the affiant does not allege whether or not it is customary to have the slips turned in by a certain hour. The observations of the officer were discontinued before noon each day, so the affidavit does not show whether more persons or fewer persons or about the same number entered the store in the afternoon hours as were seen to enter in the morning. Nor does it show any precautionary measures to prevent intrusion of unwanted guests or to prevent detection. See *Frankel v. State,* 178 Md. 553; *Goodman v. State,* 178 Md. 1. While the incidence of brown paper bags as standard numbers equipment has been noted (see *Gatewood v. State,* 244 Md. 609) here only two women carrying small brown paper bags were seen on one day entering the store. No numbers were seen being played or written or re-

ceived and no lottery slips were seen in the possession of any-
one. On one occasion a man was seen to hand another man who
came out of the store several slips of white paper and money.
The man receiving these items did not reenter the store but
drove away. There was no indication as to the size of the slips,
whether they were of a type generally used in the operation of
a lottery (see *Fleming v. State, supra*), whether they contained
numbers or writing of any kind or whether they appeared to
be numbers slips. The import of the conversation between the
two boys is uncertain. The boy not wearing the red hat, planned,
by what he said, to go to Randy's store to buy a bag of potato
chips with the nickel Miss Mary had given him for delivering
her numbers to "the store." But it is not clear whether he had
already delivered the numbers or was on his way to deliver
them. Nor is it clear that the store to which he had delivered
them or was going to deliver them was Randy's or some other
store. The confusion is not clarified in the affidavit. It contains
no statement that the affiant had seen the boy who received the
nickel enter or leave Randy's store prior to the overheard con-
versation, although at the time of the conversation, 11:50 A.M.,
the affiant had been observing the store for almost two hours,
nor does it state that the affiant saw him or his companion en-
ter the store after the conversation. For some reason undis-
closed in the affidavit, the affiant discontinued his observations
six minutes after the conversation took place and no further
mention is made of the boys.

We do not think that the trial judge was justified in finding
probable cause for the issuance of the warrant. We do not be-
lieve that this is such a doubtful or marginal case as to allow its
determination to be by the preference to be accorded to war-
rants. Compare *Propst v. State,* 5 Md. App. 36. We feel that
the facts and circumstances in the affidavit showed, at the most,
suspicion or possibility that violations of the lottery laws were
being conducted on the premises and in the automobile desig-
nated in the warrant. Suspicion or possibility is not enough.
The admission of the challenged evidence was error.

> *Judgments reversed; case remanded
> for a new trial; costs to be paid
> by the Mayor and City Council
> of Baltimore.*