JON FREDERICK PEARSON *v.* STATE OF MARYLAND

[No. 19, September Term, 1975.]

*Decided November 3, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and MOORE, JJ.

*Samuel L. Serio, Assigned Public Defender,* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Richard Palumbo, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

## STATEMENT OF THE CASE

Three criminal informations charging violations of the laws concerning controlled dangerous substances were filed in the Circuit Court for Prince George's County against JON FREDERICK PEARSON, Deborah Lee Royston, Edward Robert Hicks, James Robert Collett and Fred James Raduazo. When the informations came on for trial, Hicks and Raduazo failed to appear. The State proceeded against Pearson, Royston and Collett. The defense stated that the three informations arose out of "one search, one arrest, one incident which occurred on May 22nd, 1973." The court, at the request of the defense, directed the State "to elect at this time which [information] you want to go forward on." The State designated no. 13975, filed 14 December 1973, which charged possession on 22 May 1973 of a controlled dangerous substance, MDA, by the 1st count and of controlled paraphernalia by the 2nd count.[1] Trial proceeded jointly as to Pearson, Royston and Collett under pleas of not guilty, Pearson and Royston before a jury and Collett before the court. A preliminary matter regarding the constitutional validity of a search and seizure was presented to the court. There was a plenary hearing out of the presence of the jury,[2] at the conclusion of which the judge found that the challenged evidence was not illegally obtained. He ruled: "This being accepted as a motion to dismiss in behalf of each of the present Defendants, Royston, Pearson and Collett, the motion to dismiss is denied." [3]

---

1. A *nolle prosequi* as to Pearson, Royston and Collett was entered with respect to the other two informations, nos. 13467 and 13545. On 8 May 1974 a *nolle prosequi* was entered as to Hicks and Raduazo with respect to all three informations.

2. See Winebrenner v. State, 6 Md. App. 440 (1968).

3. It would seem that the motion properly went to the suppression of evidence allegedly obtained as a result of an illegal search and seizure. Maryland Rule 729. An illegal search and seizure does not require that the charging document be dismissed. See Hall v. State, 5 Md. App. 394, 396, n. 1 (1968). Compare State v. Swales, 12 Md. App. 69 (1971). *See* State v. Graziano, 17 Md. App. 276 (1973); State v. Lee, 16 Md. App. 296 (1972). The State may be able to prove the *corpus delicti* and criminal agency of the accused by evidence other than that suppressed as illegally obtained.

The preliminary hearing on the validity of the search and seizure consumed most of the morning. Upon its conclusion, the venire were brought in, were questioned on *voir dire*, and a jury was empanelled and sworn. The court then recessed for lunch. Collett and Pearson reacted in different ways to the ruling of the trial court. Collett changed his plea to guilty; [4] Pearson disappeared.

When the court convened after the luncheon recess, Pearson's attorney asked to approach the bench. The transcript reads:

> "MR. HUGHES [George Hughes, Esq., Pearson's Counsel]: May it please the Court, during the noon recess I had the opportunity to discuss possible plea bargaining with Mr. Palumbo, the State's Attorney. As a result thereof I met my client in the hall at one fifteen, I think, maybe one ten and conveyed to him the topic of our plea bargaining and conversations. I then turned my back for a few minutes and I looked around and my client was gone. I haven't seen him since then. I don't know whether he's still in the building or not. I'd like the opportunity to go downstairs and check to see if he's downstairs or any place in the building before we proceed.
>
> THE COURT: I don't see where that's going to do any good to look for him. He knows better than that. He knew what time he was due back here. I don't know what's going on in this case, but I don't like it. All right. Is that all?
>
> MR. HUGHES: That's all I have, Your Honor."

The court was of the opinion that in the circumstances the trial of Pearson could continue without Pearson's presence. A recess was granted to give counsel an opportunity to

---

4. The court granted the State's motion to amend the 1st count as to Collett to allege that the controlled dangerous substance was marijuana rather than MDA. Thereupon Collett withdrew his plea of not guilty generally and pleaded guilty to the 1st count. The 2nd count was *nol prossed* as to him. On 7 June 1974 the guilty plea was stricken, and, with his consent, he was placed on probation for a period of two years without the finding of a verdict. Code, art. 27, § 641.

research the question. When court reconvened forty-eight minutes later, defense counsel in response to the court's inquiry, said that he had no further knowledge of Pearson's whereabouts. The court noted that defense counsel represented "that he had discussed the case with the Defendant Jon Frederick Pearson during the luncheon recess and for no apparent reason at all the Defendant, when his Counsel had his back turned the Defendant disappeared and hasn't shown since then." The court said:

> "Now, the Court is going to rule that he has voluntarily absented himself for the trial. He's in contempt of Court. The Court rules that he is in contempt of Court for absconding, leaving during the recess. We would order a forthwith bench warrant issued for the Defendant at this time and we will direct that the State's Attorney, the case be commenced right away in the absence of the Defendant since he's done this voluntarily."

Defense counsel objected "because under Maryland Rule 775 . . . I can't voluntarily waive his right to be present at all stages of the trial." [5] The court replied:

> "We understand that it isn't being done, but by him absenting himself the Court declares that he has done this on his own and he had a right to be here. If he elects not to be here, then he must bear the consequences, and the wheels of justice can't be

---

5. Maryland Rule 775 provides *inter alia:*

"The accused shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as provided in this Rule. The accused shall have the right to be present at the taking of a deposition taken at the instance of the prosecution. In a prosecution for an offense not punishable by death the defendant's voluntary absence after the trial has commenced in his presence shall not prevent continuing the trial to and including the return of the verdict."

See Collins v. State, 12 Md. App. 239 (1971), affirmed, State v. Collins, 265 Md. 70 (1972); Smith v. State, 12 Md. App. 130 (1971). See also Brown v. State, 272 Md. 450 (1974).

stopped just because he happened to absent himself. We feel we can go ahead and we intend to go ahead."

The court directed the Clerk to have the docket show that Pearson "is held in contempt of Court for failure to appear after lunch . . . and also show the forthwith issuance of the bench warrant. . . ." The docket reads:

"5/7/74. Ordered by Judge Bowie; Mrs. Henning, Reporter, that Defendant Pearson be and is hereby adjudged in Contempt of Court for not appearing for trial after lunch and that Bench Warrant issue forthwith.

5/7/74 Bench Warrant issued."

The trial proceeded. At the close of the State's case motions for judgment of acquittal were made and argued. The motion by Pearson was denied; the motion by Royston was granted. The judge thought that the jury were "entitled to know what's been going on today", noting, "You have been in your jury room most of the time." He told the jury:

"The case started out this morning when we had five co-defendants, two of them hadn't shown, so we started off with three, and then before we got off the ground with the trial one of the Defendants elected to plead guilty to a lesser charge, which left two, and then during the luncheon recess one of the Defendants, Mr. Hughes' client, just walked off, and the Court ruled that since the jury had been sworn a trial had started and he has an absolute right to be here present during his trial, but if he walks off, then we have a right to go ahead and try him in absentia, which is what we have done."

When court reconvened the next morning, the judge, out of the presence of the jury, asked if Pearson had been found. The transcript reads:

"MR. HUGHES: Your Honor, as Defense Attorney

and as an officer of the Court I went back to my office last night and I received a telephone call from Mr. Pearson.

THE COURT: From who?

MR. HUGHES: Mr. Pearson. I asked him why he had taken off, and he said he was in fear, that he didn't want to go to jail. I implored him to come here this morning and to stand and face this and not to stay away. He advised me that he would think about it, and that's the extent of the conversation.

THE COURT: He didn't say where he was or —

MR. HUGHES: No, sir. I don't know where he was.

THE COURT: And, of course, there is a bench warrant out from the Sheriff's Office.

MR. HUGHES: I told him that, Your Honor. I advised him of that. I told him there was a bench warrant out for him and he would be summarily arrested and brought before the Court.

THE COURT: Did you tell him that the case went on yesterday and that we'd conclude it this morning?

MR. HUGHES: Yes, sir, I did."

There followed a discussion regarding instructions. The jury were brought in. The defense rested and renewed its motion for judgment of acquittal. It was denied. The judge addressed the jury:

"Members of the jury, that puts us at the posture of the case where we were yesterday evening, and that was that the Defendant, Jon Frederick Pearson, as you recall, was present in the courtroom when we conducted the voir dire examination before you were selected as members of this panel. You were sworn, we recessed for lunch, and after consulting with his counsel, through no fault of Counsel at all, the Defendant walked off. We are told that he called his Counsel

last night at his office and was advised by Counsel that the trial had gone on and that he would have an opportunity to put on his defense this morning. He said he'd think about it. Well, apparently he's thought about it and concluded that he still wants to voluntarily absent himself from the trial. While we are on this . . . Well, we'll reach that point again in a minute, members of the jury."

He then proceeded with the charge, during which he again discussed the absence of Pearson:

"Now, members of the jury, had Mr. Pearson elected to stay here, he as any other Defendant has an absolute constitutional right not to take the stand. Remember, it's the burden of the State to prove the Defendant guilty beyond a reasonable doubt, it is not the burden of the Defendant to prove himself innocent. As we understand the law, if a Defendant elects to voluntarily absent himself from trial, the trial can proceed because he did this in a voluntary manner of his own judgment, knowing and being advised that he had an opportunity to be present at his own trial. The fact that he has elected not to be present at his trial, members of the jury, we would direct you not to hold this against him but to evaluate the evidence as you have heard it just as if he had been here during the time of the trial."

At the conclusion of the charge, defense counsel expressly stated that there were no exceptions. The jury retired to deliberate. They returned in approximately an hour and rendered a verdict of guilty as to count 1 and not guilty as to count 2. The court referred the matter to the Division of Parole and Probation for a presentence investigation. It noted: "The bond has already been revoked and there is an outstanding bench warrant. That's all we can do at the present time."

There are several docket entries thereafter concerning Pearson:

> "8-22-74. Stet. Bench Warrant to remain in effect as to Pearson. . . .
>
> 11-6-74   Return 'Cepi', filed 11-3-74. (Pearson)
>
> 11-7-74   Continued for sentencing on November 12, 1974 before Judge Bowie (Pearson) . . . Motion by State to remove Pearson from Stet Docket.
>
> Motion granted."

Pearson showed up at the penalty stage of the trial on 12 November. Minor corrections were suggested by him with respect to information contained in the presentence investigation report, but, according to his counsel, as to the remaining portions of the report, Pearson found "nothing in there that is of error and no amendments or corrections are to be made." The matter of Pearson's absence at the trial was discussed:

> "MR. KRAVETZ [Arthur A. Kravetz, Esq., Assistant State's Attorney. He was not the prosecutor at the trial]: I beg your pardon, your Honor?
>
> THE COURT: Do you know anything about this?
>
> MR. KRAVETZ: The only thing I know about the incident is that from reading the P.S.I. I understand he left court in the middle of the trial.
>
> THE COURT: Do you have any statement to say on behalf of the State's Attorney's office?
>
> MR. KRAVETZ: Yes, your Honor. In regard to the behavior of the defendant and his prior criminal record, the State would have no alternative but to recommend the maximum period of incarceration in this case.
>
> THE COURT: Very well, Jon Frederick Pearson, would you stand up. You can have a seat Mr. Hughes.

Do you wish to say anything before we impose sentence in your case, in addition to — do you have anything else to add in addition to what we have read and heard and recall from the trial and recall about your absenting yourself, before we impose sentence in your case?

You are here to be sentenced, you know, for what the jury found you guilty of, as well as the Court found you in contempt of Court for absenting yourself, and you must be sentenced for that today, too. Do you have anything to add?

JON FREDERICK PEARSON: I would just like to apologize to the Court for leaving like I did. I just felt it was a right thing to do at the time. I felt —

THE COURT: Why?

JON FREDERICK PEARSON: Because I'm not guilty. One of the other defendants in the case was guilty, but he wanted — didn't want to step forward and assume the responsibility.

THE COURT: If that is so why didn't you hang around and assert yourself and tell the jury what happened?

JON FREDERICK PEARSON: Well, due to my past in the court —

THE COURT: I see your past according to the record, but if you weren't guilty it was incumbent upon you to stick around and convince the jury that you weren't. But to suggest to the Court that you were totally innocent of it is a little hard for the Court to visualize, in view of your actions in leaving right in the middle of the jury trial without explaining to the jury what your problem was.

JON FREDERICK PEARSON: I understand that, your Honor. It's just the fact that the last time I was before the Court I was innocent, too, you might say, and I spent eighteen months in jail before the Court of Appeals reviewed my case and it was

handed back to the Circuit Court before I was exonerated of the charges.

Taking that in mind I just — I was just scared and didn't want to go to jail. I figured it was the best thing for me. But I don't know. I went to Florida and stayed down there for a few months and I just got tired looking over my shoulder and decided to come back and take what the Court deems necessary to give me.

THE COURT: But Mr. Hughes related to the Court later, your attorney, that he had seen you up, I think, in the Adelphi area. Isn't that right, Mr. Hughes?

MR. HUGHES: Riverdale area.

THE COURT: Riverdale area. When was that, sir, do you recall?

MR. HUGHES: Sometime after the trial.

THE COURT: Rather shortly after, wasn't it?

MR. HUGHES: Yes, sir.

THE COURT: Before the time set for sentencing?

MR. HUGHES: Yes, sir.

THE COURT: Okay. He couldn't convince you that you were wrong either, is that right?

JON FREDERICK PEARSON: That's correct, your Honor.

I gave this a lot of thought before I left and I don't know — I guess I did the wrong thing, but at the time it seemed like I was doing the right thing. All I could think about was wanting to be free for a while and it got to me after a while. I figured the best thing to do is come back to Maryland and get it over with, which I should have done before this. But I have been there so many times before in jail that my head wasn't really clear at the time.

THE COURT: Very well. Of course, not only did the jury find you guilty of Count 1, the maximum sentence for which is four years or $25,000 fine, or

both, but then, of course, the Court on the day of trial, on May 7th, 1974, for the record, when you failed to show up after lunch, we found you in contempt of Court for not appearing for trial after lunch.

As to Count 1, we think that whether or not you are guilty has been determined by the jury. It then becomes the Court's duty to sentence you. I believe, Mr. Sheriff, he has been in since November the 3rd, is that it?

THE DEPUTY SHERIFF: Yes, sir.

THE COURT: Are there any other periods of incarceration, Mr. Hughes, for this offense? He was on bond up until that time?

MR. HUGHES: Yes, sir, that is correct.

THE COURT: Madam Clerk, have the docket show the defendant is sentenced to the jurisdiction of the Division of Corrections for the period of four years commencing November the 3rd, 1974, as to Count 1. Then as to the contempt on May 7th, have the docket show the defendant is sentenced to the jurisdiction of the Division of Corrections for the period of two years, to be consecutive to that just imposed on Count 1.

You are cautioned that you have thirty days from today in which to appeal your case, thirty days from today in which to ask for a review of sentence, and ninety days from today to ask for a reconsideration of sentence."

Pearson tried all three. On 3 December 1974 he requested a reduction of sentence. The same day it was denied by order of the court accompanied by a memorandum. On 6 December he noted the appeal which is now before us. On 9 December he moved for a review of sentence. A review panel was assigned on 9 December, and on 28 February 1975 it ordered that the sentence remain unchanged. There is left the determination of the direct appeal.

The appeal was noted "from the verdict and sentence of November 12, 1974." We take this to mean from the judgment on the substantive offense and from the judgment on the matter of contempt. Courts Art. § 12-301 and § 12-304 (a). Pearson presents four contentions. Two of them go to the substantive crime, and two concern the contempt judgment.

## THE JUDGMENT ON THE SUBSTANTIVE CRIME

Pearson urges that the judge committed reversible error in informing the jury, (1) of his absence at trial, and (2) of the guilty plea of the co-defendant, Collett, to a lesser charge. They may be disposed of summarily. The short answer is that no timely objection or exception was made to the remarks now challenged. Their propriety is not properly before us. Maryland Rule 554; *Levine v. Rendler*, 272 Md. 1 (1974); *Montgomery Ward & Co. v. McFarland*, 21 Md. App. 501 (1974); *Podolski v. Sibley*, 12 Md. App. 642 (1971). In any event, we think the jury were entitled to know what happened with respect to Collett, who was being jointly tried with Pearson with no objection noted. We also think they were entitled to know why Pearson disappeared during the course of the trial. We point out that the judge carefully pointed out that the jury were not to hold Pearson's absence against him and cautioned that they were "to evaluate the evidence as you have heard it just as if he had been here during the time of the trial." The contentions presented afford no reason to reverse the judgment of conviction and sentence under the 1st count of information no. 13975. It is affirmed.

## THE JUDGMENT ON THE CONTEMPT OF COURT

We shall discuss the contentions concerning the judgment as to contempt of court as best we are able to understand them. The difficulty is that the delineation of the argument in the brief seems not to follow the question as presented, and the discussion thereon appears somewhat foreign to both. Pearson asks:

"Is the absenting of oneself from the trial of his case a contempt of court punishable by incarceration? "

He heads the argument under this question thus:

"The absenting of oneself from the trial of his case is not a direct contempt of court."

The argument which follows may be fairly summarized in the language of the brief:

"At the point in time when the trial judge held appellant in contempt of court, there was no positive indication that appellant had voluntarily absented himself, and the court was obliged to explore the matter more fully before determining that appellant 'is in contempt of court for absconding, leaving during the recess.' "

These actually pose several different points. Pearson also asks:

"Did the trial judge have the power to sentence appellant to two years incarceration for contempt of court for absenting himself from the trial without first determining whether or not the absenting was voluntary, or otherwise affording appellant a hearing on the contempt charge? "

He heads the argument under this question thus:

"The trial judge did not have the power to find the appellant in contempt of court and to incarcerate him for an additional two years for the unindicted crime of contempt of court."

He argues that "absenting oneself from the trial of his criminal case is not a disruption of the court proceeding which, in this case, proceeded smoothly without the defendant. Nor is this absenting an attack on the dignity of the court. . . ." He refers to Courts Art. § 1-202; Code, art. 26, § 4; Maryland Rule P. He claims failure to follow required procedures, denial of a jury trial, and lack of due

process. He invokes the fifth and sixth amendments to the Constitution of the United States and article 21 of the Declaration of Rights, Constitution of Maryland.

*The Appeal*

Courts Art. § 12-304 (a) provides:

"*Scope of Review.* — Any person may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action."

In *Ex Parte General News Bureau,* 162 Md. 643 (1932), the Court construed this statute as it formerly appeared.[6] It said, at 648, that the law "contemplated appeals on records showing defenses interposed in the court by which the judgment in contempt was rendered." Upon the finding below that Pearson was in contempt, defense counsel interposed an objection. It may have been that he was objecting only to proceeding with the trial without Pearson, but that is so intertwined with the contempt proceeding that we shall consider it as a challenge to the summary finding of contempt, sufficient to preserve the propriety of the court's action thereon for our review.[7]

---

6. According to the Revisor's note § 12-304 is basically art. 5, § 18, repealed by Acts 1973, 1st Sp. Sess. ch. 2, § 2, effective 1 January 1974; 1974 ch. 691, § 1, effective 1 July 1974. The substance of art. 5, § 18 was at one time codified as art. 5, § 108.

7. For reasons which will become apparent, we do not reach the question whether the court was clearly erroneous in determining that Pearson had voluntarily absented himself from his trial. As to scope of review in non-jury contempt cases, see Kandel v. State, 252 Md. 668 (1969). We observe that Cureton v. United States, 130 App. D. C. 22, 396 F. 2d 671 (1968), cited and relied on by Pearson, in remanding for development of the issue of voluntariness of the absence, suggested that the circumstances under which the defendant was taken into custody after the trial shall be considered, thus giving relevance to his actions following the failure to return to the trial.

*The Law Relating to Contempt of Court*

Courts Art. § 1-202 (a) declares:

"A court may exercise the power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by the Maryland Rules or Maryland District Rules."

The Revisor's note gives an elucidating glimpse into the enactment of the statute. Code, art. 26, § 4, which was repealed by Acts 1973, 1st Sp. Sess., ch. 2. § 2, effective 1 January 1974, under the heading "Contempt of Court", provided that "The power of the several courts of the State to issue attachments and inflict summary punishments for contempt of courts shall not be construed to extend to any cases except the following: [designating seven punishable acts]." The note refers to this statute:

"Article 26, § 4 purports to limit the power of a court to inflict summary punishment for contempt. One of its earliest versions seems to have been ch. 450, Laws of 1853. In Ex parte Maulsby, 13 Md. 625 (1859) the Court of Appeals held that courts had inherent power to punish for contempt by summary conviction. It went on to say that the Act of 1853 did not confer jurisdiction, but was merely declaratory of the common law.

Later decisions indicate that the list of punishable acts in Article 26, § 4 is not limiting on the courts, and also is not all-inclusive as a statement of the common law; Weaver v. State, 244 Md. 640 (1966). Moreover, it would be unconstitutional for the legislature to attempt to strip the courts of their inherent contempt power; Baltimore Radio Show v. State, 193 Md. 300 (1949).

It is clear that Article 26, § 4 refers only to direct contempts, but the legislature has not attempted to define the limits of constructive contempt, even if it has the power to do so; Hitzelberger v. State, 173 Md. 435 (1938).

> The line of cases rejecting the legislature's ability to limit the exercise of contempt power, or at least judicial statements reiterating that view, have continued up to the present; see, e.g., Kandel v. State, 252 Md. 668 (1969); McDaniel v. McDaniel, 256 Md. 684 (1970); Goldsborough v. State, 12 Md. App. 346 (1971); Muskus v. State, 14 Md. App. 348 (1972); and Roll v. State, 15 Md. App. 31 (1972).
>
> In view of this case law, Article 26, § 4 is misleading in form and probably of little real benefit. The revision commission concluded that equal usefulness would be a simple statement of contempt power and a reference to the Maryland Rules."

It is manifest that Courts Art. § 1-202 (a) merely recognizes the inherent power of a court to punish for contempt and to compel compliance with its commands. It does not attempt to define the ambit of that power. But the power may be exercised only as the Maryland Rules and District Rules spell out. The procedural requirements of the Rules are mandatory; their dictates must be followed. See *Robinson v. State*, 19 Md. App. 20, 25 (1973).

The rules applicable to contempt proceedings in the circuit courts are in the Maryland Rules, chapter 1100, "Special Proceedings", subtitle P, "Contempt." After three basic definitions set out in Rule P1 — "A 'direct contempt' means a contempt committed in the presence of the court, or so near to the court as to interrupt its proceedings", § a; "A 'constructive contempt' means a contempt which was not committed in the presence of the court, or so near to the court as to interrupt its proceedings", § b; " 'Defendant' means a person against whom contempt proceedings have been instituted", § c — and after specifying the application of the subtitle in Rule P2 — it "shall apply to both civil and criminal contempts" § a; to contempt in the Court of Appeals and the Court of Special Appeals, except as to constructive contempt, § b; but it shall not modify or supersede certain statutory provisions concerning labor

cases, § c — the Rules deal with direct contempt, Rule P3; constructive contempt, Rule P4, and provide that a defendant has the same rights with respect to admission to bail pending appeal as an accused in a criminal proceeding, Rule P5.

It is manifest from Rule P that Maryland recognizes the classification of contempts of court into two categories, (1) direct or constructive, and (2) civil or criminal. We said in *Roll and Scholl v. State*, 15 Md. App. 31, 47 (1972): " The categories are not mutually exclusive and contempts are usually classified in terms of both categories." See *State v. Roll and Scholl*, 267 Md. 714, 727 (1973) in which the Court of Appeals used with approval the substance of this language. So a contempt may be direct and civil, or direct and criminal, or constructive and civil, or constructive and criminal. Under what classification a contempt falls may be of the utmost importance, and the proper classification is often hard to come by. The problem with the definitions of direct contempt and constructive contempt set out in Rule P1, §§ a and b, as the Court of Appeals noted in *State v. Roll and Scholl, supra,* at 732, is what the Rule contemplates by "in the presence of the court, or so near the court as to interrupt its proceedings." Looking to the Supreme Court of the United States,[8] the Court of Appeals concluded, *id.,* 734:

---

8. The Court of Appeals said in State v. Roll and Scholl, at 733-734:

"The United States Supreme Court has often expressed the opinion that a summary contempt proceeding should be the exceptional case. Such proceedings are only proper in cases where the action of the alleged contemnor poses an open, serious threat to orderly procedure that instant, and summary punishment, as distinguished from due and deliberate procedures, is necessary. In other words, direct contempt procedures are designed to fill the need for immediate vindication of the dignity of the court. Harris v. United States, 382 U. S. 162, 15 L.Ed.2d 240, 86 S. Ct. 352 (1965); Cooke v. United States, 267 U. S. 517, 69 L. Ed. 767, 45 S. Ct. 390 (1925). As the Supreme Court stated in Johnson v. Mississippi, 403 U. S. 212, 29 L.Ed.2d 423, 91 S. Ct. 1778 (1971), 'instant action may be necessary where the misbehavior is in the presence of the judge or is known to him, and where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court.' But, it is recognized that at times immediate action taken against an attorney guilty of contempt is likely to prejudice his client. If this is the case, it is best to wait until the end of the trial and a more deliberate path followed. Sacher v. United States,

"We think the content and meaning of the phrase 'in the presence of the court' as used in Rule P1 a and the procedure sanctioned by Rule P3 for conducting a direct contempt proceeding must be framed against a constitutional background. When this is done, the picture is clear. A direct contempt occurs when the actions of the contemnor interrupt the order of the courtroom and interfere with the conduct of business. When such disruption occurs within the sensory perception of a presiding judge he will have a sufficient knowledge of the contemptuous act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony."

We have no difficulty in determining that, if Pearson, as alleged, voluntarily absented himself from his trial after it commenced, the act was contemptuous. He was then a defendant on trial who removed himself from the presence of the court without the court's permission. The authority for the trial to proceed without him did not relieve him of the obligation to be present. The presence of an accused at his trial enhances the fair administration of justice. We observed in *Billinger v. State*, 9 Md. App. 628, 629-630 (1970), *cert. den.* 259 Md. 729: "In our society no person has a constitutional right to be an anonym. So when he is suspected of or accused of having committed a crime he may be displayed by the State to prospective identifying witnesses", within the protection, however, of constitutional guarantees. Moreover, Pearson had been released on bond

343 U. S. 1, 96 L. Ed. 717, 72 S. Ct. 451 (1952). And, while not required, when a judge waits until the end of the trial, it is generally wise to ask a fellow judge to rule on the nature of the conduct of the contemnor if it has in it elements of personal attack upon the judge. The judge must banish personal impulses to reprisal, or to vent his spleen. Mayberry v. Pennsylvania, 400 U. S. 455, 27 L.Ed.2d 532, 91 S. Ct. 499 (1971); Cooke v. United States, supra. Of course, the limits of the power to punish for contempt are 'the least possible power adequate to the end proposed.' Harris v. United States, supra." (footnote omitted)

pending trial, upon a recognizance accepted by and filed in the court, on the condition to "well and truly make his personal appearance from day to day . . . after indictment or after a criminal information shall have been filed against him, before any judge of the Circuit Court for Prince George's County . . . whenever his appearance is or may be required in connection with a charge of having committed the crime of possession of [a controlled dangerous substance and paraphernalia] on or about the 22nd day of May 1973, or any other or additional charge . . . with respect to which a criminal information may be filed against him, at any time and from time to time until the said charge shall have been finally disposed of, then the above recognizance shall be void, and of none effect, otherwise to remain in full force and virtue in law." He was free pending trial on conditions which the court reasonably expected to be fulfilled. Pearson did not have the choice of attending or not attending his trial. He was obliged to be present and voluntary absence would be at his peril. Forfeiture of the bond for such non-appearance is not the only permissible sanction. We think that a voluntarily absent accused may also be held in contempt of court.

The question is, what kind of contempt would such action constitute. Viewed in the light of the Court of Appeals' construction of the language of Rule P3, §§ a and b, the offensive act of Pearson, assuming it was voluntary, was not a direct contempt. His failure to return to the courtroom after the luncheon recess did not, in fact, interrupt the order of the courtroom and interfere with the conduct of business. The trial promptly proceeded to verdict, without him as authorized by Rule 775, and without prejudice to the State, claimed or existent. The behavior of Pearson, therefore, constituted a constructive contempt. The court below, however, proceeded as if Pearson had committed a direct contempt by summarily punishing him.[9] It had no authority

---

9. Even if Pearson had committed a direct contempt, the trial court apparently failed to follow the explicit procedures dictated by Rule P3, § b, which provides:

"Where a direct contempt is committed, the court shall sign a

to do so, and should have proceeded under Rule P4, applicable to constructive contempt.

Our determination that a person who voluntarily absents himself after his trial has commenced commits a constructive contempt does not end our inquiry. It must be ascertained whether such constructive contempt is civil or criminal.

In *Roll and Scholl v. State, supra,* at 60, we quoted *Sheets v. City of Hagerstown,* 204 Md. 113, 120: "The line of distinction between civil and criminal contempt is often indistinct. Often the same acts or omissions may constitute both or at least embrace aspects of each." See *State v. Roll and Scholl, supra,* at 728. We noted, 15 Md. App. n. 22 at 60: "A practical illustration of the confusion existing in distinguishing civil and criminal contempts is found in *Shillitani v. United States,* 384 U. S. 364, 369. See *Cheff v. Schnackenberg,* 384 U. S. 373, 383, n. 4." The Court of Appeals in *Tyler v. Baltimore County,* 256 Md. 64, 71, enunciated what seemed to be a simple standard test: "[I]f the contempt order is coercive in order to remedy the contemptuous act or omission, the contempt was civil, if it is punitive the contempt was criminal." In *State v. Roll and Scholl, supra,* at 729, however, the Court of Appeals thought that "any test which makes the determinative nature of the contempt proceeding dependent upon the sanction imposed at the conclusion of the proceeding is unacceptable." It observed: "Maryland law does not rely on that basis for its classifications," and pointed out: "In this State, the nature of the proceeding is determined before the time for imposing punishment is reached." *Id.,* at 729. It referred to *Winter v. Crowley,* 245 Md. 313, 317 (1967) which delineated the basic

---

written order to that effect. The order shall recite the facts, be signed by the judge and entered of record. The order shall state which of the facts were known to the court of its own knowledge and as to any facts not so known, the basis for the court's finding with respect thereto."

Section c (1) requires that the order be included in the record. No order of contempt, complying with Rule P3; § b, appears in the record transmitted to us.

criteria for determining if a proceeding was a civil contempt. Five factors generally point to a civil contempt:

> "(1) the complainant is usually a private person as opposed to the State; (2) the contempt proceeding is entitled in the original action and filed as a continuation thereof as opposed to a separate and independent action; (3) holding the defendant in contempt affords relief to a private party; (4) the relief requested is primarily for the benefit of the complainant; (5) the acts complained of do not of themselves constitute crimes or conduct by the defendant so wilful or contumelious that the court is impelled to act on its own motion." *Id.*, at 729-730.

This test, explained the Court of Appeals, permits a determination of the nature of the proceeding at the outset. "From this, rights, procedural requirements and the manner of the punishment flow. If it is a civil contempt the sanction is coercive and must allow for purging, ... but if it is criminal, it is punitive and must be determinate. However, conditions may be attached to the determinate sentence which provide for an earlier termination." *Id.*, at 730. The act of which Pearson was accused patently did not meet the test of a civil contempt. It was a criminal contempt. Thus, the court below had to deal with a constructive-criminal contempt.

As the proceedings against Pearson were in the constructive contempt category,[10] he could not be summarily punished by the court. The dictates of Rule P4 had to be observed. We summarized them in *Roll and Scholl v. State, supra,* at 48-49:

> "Thus Rule P4 a provides that although constructive contempt proceedings may be instituted by the court of its own motion, they may

---

10. Constructive contempts are also known as "indirect" contempts. Blackstone called them "consequential" contempts. 4 W. Blackstone, Commentaries *284.

also be instituted by the State's Attorney or by any person having actual knowledge of the alleged contempt. A person cited for constructive contempt is entitled to show cause within a stated time why an order adjudging him in contempt shall not be issued, to a hearing after notice of its time and place, to a reasonable time for the preparation of his defense, to a statement of the facts constituting the contempt charged, and to be served with a copy of any writing or document filed in support of the alleged contempt. These matters shall be set out in an order issued by the court determining to cite the person for contempt and the order shall be served on such person pursuant to the rules regarding service of process (Rule 104) unless the person has appeared as a party in the action in which the contempt is charged, in which case service shall be in the manner prescribed by the court. Rule P4 b 1 (a) (b) (c) and 2. Further, unless the alleged contemnor otherwise consents, the judge who issued a citation for constructive contempt shall be disqualified from presiding at the hearing except where such contempt consists of failure to obey an order or judgment in a civil case. Rule P4 d 2."

See *State v. Roll and Scholl, supra,* at 731-735.[11]

As the proceedings against Pearson were also in the criminal contempt category, safeguards applicable to a criminal proceeding were applicable. Although a contemnor in a criminal contempt is not entitled to indictment by a grand jury or to have an information filed charging him with the offense, the contempt must be proved beyond a reasonable doubt, the accused cannot be compelled to testify

11. A discussion of the contempt power in 11 Arizona L. Rev. 501-530 (1969) points out that the rights to notice, hearing and counsel have historically been accorded to contemnors whose offense was classified as a constructive contempt. At least since 1925 these rights have had a constitutional basis, see Cooke v. United States, 267 U. S. 517, and had their roots in the common law announced by Blackstone, who was cited by Taft, C. J., several times in the Cooke opinion.

against himself, he cannot be placed in double jeopardy, and "except when a contempt may be dealt with summarily, the panoply of fundamental due process rights comes into play." *State v. Roll and Scholl, supra,* at 731. The Court noted, *id.,* at 731, n. 12: "These include not only the right to notice, and the opportunity to be heard but also the right to counsel and with the possibility of imprisonment an indigent has the right to have an attorney appointed for him. Argersinger v. Hamlin, 407 U. S. 25, 32 L.Ed.2d 530, 92 S. Ct. 2006 (1972). *Argersinger* broadens the requirements for assignment of counsel under Maryland Rule 719 b 2 (a), but there must still be compliance with the other mandate of that rule." The contemnor may also be entitled to a trial by jury in criminal contempts. Although the "punishment test" was not acceptable to the Court of Appeals to determine whether a contempt proceeding was criminal or civil, *State v. Roll and Scholl, supra,* at 729, that test cannot be avoided in determining whether the contemnor is entitled to a jury trial. We said in *Roll and Scholl v. State, supra,* at 49-50:

> "We observe that in criminal contempts, both direct and constructive, where the sentence imposed is not petty, that is the sentence imposed is 6 months or more, the alleged contemnor is entitled to a trial by jury, thus restricting, in the case of direct criminal contempts, the power of the court to inflict punishment summarily. This right was reached through three cases. *Cheff v. Schnackenberg,* 384 U. S. 373 held, under the supervisory power over the federal courts rather than on constitutional grounds, that when the punishment in a criminal contempt was more than a petty sentence. the federal courts were required to grant a jury trial. *Duncan v. Louisiana,* 391 U. S. 145 held that the sixth amendment right to a jury trial for serious offenses applied to the states through the fourteenth amendment. In *Bloom v. Illinois,* 391 U. S. 194, the Court concluded, departing from its holding in *United States v. Barnett,* 376 U. S. 681, although forecast by dictum

in note 12 at 695 thereof, that the constitution did require a jury trial in contempt cases where the sentence was more than petty."

We noted, *id.*, at 49, n. 13: "If there is a maximum sentence of six months or more authorized by the legislature the defendant would be entitled to a jury trial regardless of the sentence actually imposed." [12]

It is manifest that the court below did not observe the requirements of a proceeding involving a constructive-criminal contempt in finding Pearson guilty of contempt of court and sentencing him to two years thereon. That judgment is set aside and the proceeding remanded so that a hearing in compliance with the law may be had as to the contempt.

> *Judgment under the first count of the information in criminal trials No. 13975 affirmed.*
>
> *Judgment as to contempt of court vacated and proceeding remanded for a new hearing pursuant to this opinion.*

---

**12.** In State v. Roll and Scholl, *supra,* at 730, the Court of Appeals said that a contemnor in a criminal proceeding "may not have a right to a jury trial. . . ." It noted, at 730, n. 11: "The right to a jury trial is guaranteed if the offense is serious, *i.e.,* may be punished by an imprisonment of six months or more." It cited Bloom v. Illinois, *supra.* In note 12 at 731 of their Roll and Scholl opinion the Court referred to the definition of "Serious Crime" in Code, art. 27A, § 2 (h) (2). Under that statute a serious crime includes an offense "the penalty for which involves the possibility of confinement for more than three months. . . ." And see Courts Art. § 4-302, which in declaring that the District Court is deprived of jurisdiction if a defendant is entitled to and demands a jury trial at any time prior to trial in the District Court, subsection (d) (1), provides that "A defendant may demand a jury trial in a criminal case if the penalty for the offense with which he is charged permits imprisonment for a period in excess of three months . . .", subsection (d) (2). See Robinson v. State, *supra,* n. 3 at 29.